[No. 28591. Department One. June 19, 1942.]

F. J. McKEVITT et al., Respondents, v. GOLDEN AGE BREWERIES, INC., Appellant.[1]

[1]Reported in 126 P. (2d) 1077.

*E. A. Cornelius* and *Robert Weinstein,* for appellant.

*Frank J. Blade* and *Joseph L. Thomas,* for respondents.

MILLARD, J.—F. J. McKevitt and H. E. Fraser, a co-partnership engaged in the practice of the law, instituted this action to recover against Golden Age Breweries, Inc., for attorneys' fees alleged to be due for services performed by them for defendant. The cause was tried to the court, which found that between October, 1938, and April, 1940, plaintiffs, at the special instance and request of defendant, performed legal services of the reasonable value of five hundred dollars. Judgment was entered accordingly. Defendant appealed.

Counsel for appellant contend that appellant did not, nor did any of its officers or agents, employ respondents as its attorneys; that, assuming that Robert Weinstein, who is secretary-treasurer, a member of the board of directors, and attorney for appellant, attempted to employ respondents as attorneys for appellant, he was without authority to bind appellant; and that there was no conduct on the part of appellant through its officers and agents from which the court could imply a contract employing respondents to represent appellant.

Respondents seek recovery on an implied contract, but it matters not whether the claimed agreement be considered as an express or implied contract, as the result will be the same. An implied contract differs not from an express contract except in the mode of proof. Both grow out of the intentions of the parties to the transaction, and there must be a meeting of minds whether the contract be express or implied. *Troyer v. Fox*, 162 Wash. 537, 298 Pac. 733, 77 A. L. R. 1132.

"A true implied contract is an agreement of the parties arrived at from their acts and conduct viewed in the light of surrounding circumstances, and not from their words either spoken or written. Like an express contract, it grows out of the intentions of the parties to the transaction, and there must be a meeting of minds. Such a contract differs from an express contract only in the mode of proof." *Western Oil Refining Co. v. Underwood*, 83 Ind. App. 488, 149 N. E. 85.

The evidence, which the findings and judgment reflect acceptance by the trial court as true, is as follows and clearly establishes the intentions of appellant and respondents, that Robert Weinstein was entrusted with the management of a particular part of the business of appellant, and, acting within the scope of that authority, he employed respondents:

In October, 1938, certain members of the brewery workers' union, who were former employees of appellant, brought an action against appellant, Goetz Breweries, Inc., the Spokane Breweries, Inc., and Bohemian Breweries, Inc., for damages in excess of two hundred thousand dollars. Those actions grew out of proceedings instituted in 1934-1935 in which certain members of the brewery workers' union were plaintiffs and various breweries throughout the state, together with the teamsters' union, were defendants.

In those actions, the trial court entered an order restraining the defendants from attempting to coerce the plaintiffs to join the teamsters' union under threat of discharge. Respondent McKevitt assumed the leading role for the Spokane breweries, prepared all pleadings in their behalf, and made all of the arguments in behalf of those breweries. Robert Weinstein was attorney for appellant, Horace Kimball was attorney for Bohemian Breweries, and respondents were attorneys for Spokane Breweries and Goetz Breweries. For the services mentioned above, respondents received no compensation from any of the Spokane breweries except the breweries for which respondents were attorneys.

After filing of the complaints out of which the action arose, a conference was held in the office of respondent McKevitt. Those present were respondent McKevitt, Horace Kimball, and Robert Weinstein. McKevitt asked Weinstein and Kimball what division of the work would be made between the attorneys in the defense of the cases instituted in 1938. McKevitt was informed by Weinstein and Kimball, "We want you to handle the work for the three breweries." McKevitt was also informed that he was to prepare the pleadings, make the arguments on demurrers and motions, and, in fact, perform all the work in the trial of the actions, including any appeal which might be taken. In the trial court, the argument, which consumed one and one-half days, was made solely by McKevitt, although attorneys for the other two breweries were present. Martin Woldson, president of appellant corporation, was also present in court and, when Mr. McKevitt concluded his argument, complimented him and also expressed appreciation for the services of Mr. McKevitt on behalf of the breweries.

The demurrers to the complaints were sustained,

whereupon plaintiffs filed amended complaints for recovery on a new theory, which, of course, presented an entirely different legal question than was raised in the first hearing. This necessitated further and extensive research, all of which work was performed by respondents without assistance of any character from the attorneys for the other breweries.

Respondents, on behalf of all of the defendants, without assistance or suggestion of any kind on the part of other counsel for defendants, interposed similar motions and demurrers. The argument for defendant breweries was made exclusively by respondent McKevitt, although appellant's attorney was present in court. Mr. Kimball, attorney for Bohemian Breweries, was dead at the time of the second trial. The demurrers were sustained, and judgments of dismissal were entered.

A brief on behalf of the breweries was prepared by respondents without any assistance from defendant's attorney, Mr. Weinstein. The argument in this court was made by Mr. McKevitt, although Mr. Weinstein was present. Mr. Weinstein was en route to California on a health trip and answered, when McKevitt inquired whether he desired to participate in the argument, that Mr. McKevitt had been handling the work and should make the legal argument. The trial court's judgment in favor of the defendant breweries was affirmed (*French v. Goetz Brewing Co.*, 3 Wn. (2d) 554, 101 P. (2d) 354.) Subsequently, Mr. Woldson, appellant's president, telephoned respondent McKevitt and again expressed appreciation for the services rendered by respondents on behalf of appellant.

Respondents prepared separate cost bills following the affirmance in each of the four cases. Plaintiffs' counsel filed a motion to retax costs and a brief in support of the motion, contending that only one statu-

tory attorney's fee should be allowed for the consolidated hearing on appeal. A brief in support of respondents' cost bills was prepared and filed by respondents in the case at bar, which brief recited that it was submitted by respondents and Robert Weinstein as attorneys for the respondent breweries. Following the coming down from this court of the remittiturs in the four cases, respondents fixed a fee of fifteen hundred dollars as a reasonable charge for their services and divided that cost equally between the respondent breweries. Respondents billed the breweries represented by them for five hundred dollars, which was paid; they billed the Bohemian Breweries for five hundred dollars, which was paid; and they billed the appellant Golden Age Breweries for five hundred dollars, which was not paid. A copy of the bill sent to Bohemian Breweries was transmitted to Mr. Weinstein, attorney for and secretary and director of appellant Golden Age Breweries, in a letter addressed to him by respondents on May 25, 1940, which letter reads as follows:

"In discussing with my client, the Spokane Breweries, the question of fees in the last brewery cases, Mr. Besse took the position that in view of the fact that all of the work in both the lower and Supreme Courts was done in this office, the three breweries should share equally the expenses and fees.

"Of course, you are cognizant of the fact that I prepared all of the pleadings, briefed the question for argument in the lower Court, made both arguments in the lower Court, wrote the brief in the Supreme Court, and made the argument in that Court. I have fixed a fee, which I believe reasonable, on the basis of $1500.00 and the Bohemian has already paid its one-third. I wish you would advise me the attitude of your company in this regard. For your information I enclose a copy of the bill that I sent to the Bohemian."

May 28, 1940, Mr. Weinstein replied:

"I cannot understand the motive of your letter of May 25th.

"I realize that you stated Mr. Besse brought up the question, but surely you must have acquainted him with the fact that in all the brewery cases there was a definite understanding that each brewery pay its own counsel his fees, and the costs pertaining to each case.

"In many of the cases, eminent counsel took the leading parts in the lower court, wrote briefs and appeared in the Supreme Court with that understanding, and so in this case, that was the understanding between Horace Kimball, you and myself. When Mr. Kimball passed away, you came and told me that Ed Theis had come to you to represent the Bohemian Breweries in this particular case, and that you would be representing the Spokane Breweries, the Goetz Brewery, and the Bohemian Breweries, and in view of that fact, that you would take the leading and active part in this case, to which I agreed.

"The pleadings in the Superior and Supreme Courts speak for themselves as to whom I represented and the further fact that I was present at all hearings in both courts."

June 1, 1940, respondents made the following answer to Mr. Weinstein's letter:

"I have your letter of May 28th.

"You say you cannot understand the motive of my letter of May 25th. Perhaps I can state it more simply. My client reasons thus: 'Our attorneys did *all of the work* of every kind, character and description in both the Superior Court and Supreme Court in connection with the last law suit instituted against the three Spokane breweries, including stenographic services. Through the efforts of our attorneys and our attorneys alone these cases were won on a law question, thus obviating the tremendous expense that would have been incurred by each brewery were these cases tried on the merits; Therefore, since the other breweries had the benefit of the successful services of our attorneys,

they should not expect us to assume the full financial burden.'

"Mr. Theis, of the Bohemian Brewery, is thoroughly in accord with this proposition and has made his remittance not because he had personally requested me to take over after Mr. Kimball's death, but by virtue of the fact that these cases were consolidated for hearing in the lower Court and on appeal and the Bohemian, as did the Golden Age Brewery, would have enjoyed any successful result that attended the efforts of the Spokane Brewery lawyers.

"There never was any discussion or any understanding of any kind or character in connection with these cases about each brewery paying its own attorneys' fees and expenses for the simple reason that such an understanding would presuppose that the attorneys for each brewery would perform equal services. . . .

"If you will give the matter a little further thought you should reach the conclusion, if you approach it fairly and as lawyer to lawyer, that there not only is an unassailable moral obligation on the part of your client to share in the expense of this litigation, but an obligation which the law has frequently characterized as an implied agreement.

"I sincerely trust, sir, that before writing me as per your letter of May 28th you fully, frankly and fairly place the whole situation before your board of directors, because if you did not do so it is going to be done."

█ Counsel for respondents concede that there was not an express contract of hiring, but insist there was an implied contract. While the testimony of Mr. McKevitt is in conflict with the testimony of Mr. Weinstein, the credibility of those two witnesses was for the trial court. We are convinced by our examination of the record that it was the understanding of Mr. Weinstein, Mr. Kimball, and Mr. McKevitt that the last named attorney would represent all of the breweries and perform all of the work incident to the preparation, trial, and appeal of the cases for all of the breweries. When inquiry was made of Mr. Weinstein

with reference to the cases, he referred the inquirers to Mr. McKevitt and stated that whatever Mr. McKevitt wanted to do was all right with appellant.

When Mr. Weinstein refused to have his company pay its proportionate part of the expenses and attorneys' fees in the litigation, respondents addressed a letter to the president of appellant and transmitted therewith copies of the exchange of correspondence between respondents and Mr. Weinstein. Appellant's president replied that he had read the correspondence and "will say that all legal matters are left to him and whatever action he takes meets with our approval." That letter plainly states that the payment of a fee to respondents for the services rendered to appellant would be satisfactory to appellant if appellant's attorney thought respondents were entitled to a fee. Unquestionably, appellant's president was convinced that respondents were entitled to reasonable compensation.

Even if respondents performed similar services in 1934-1935 for appellant without request for or payment of any compensation, that fact would not impose upon respondents the obligation to again gratuitously serve appellant. Mr. McKevitt, in answer to cross-examination by counsel for appellant whether he requested, in any other case, compensation from any brewery except the one for which respondents had been retained as attorneys (Goetz Breweries and Spokane Breweries, Inc.), stated that he had grown tired of performing services without compensation therefor.

In response to the question why, if there was any understanding or agreement, he would wait for Mr. Weinstein to speak concerning the matter of compensation, Mr. McKevitt testified that a lawyer handles matters differently as between lawyer and lawyer than between lawyer and client; that if a lawyer were

representing another lawyer in an action which arose out of the practice of the law, the lawyer does not say to his lawyer client that he will represent him if he pays a stipulated fee, but such attorney extends the professional courtesy of performing the work and refraining from sending a bill; that the attorney who is the defendant in the action, as a rule, goes to the attorney who represented him and inquires what the service was worth. The attorney informs his brother attorney the amount which he thinks is reasonable, or he tells his friend to buy him a new hat; or something of that kind.

The rule is well established that the acceptance of the services rendered by an attorney may raise an implied promise to pay therefor, which will supply the place of a contract of employment. If an attorney renders valuable services, as in the case at bar, to one who has received the benefit thereof, a promise to pay the reasonable value of such services is presumed unless the circumstances establish the fact that such services were intended to be gratuitous. 5 Am. Jur. 352; 6 C. J. 730-731; *Isham v. Parker*, 3 Wash. 755, 29 Pac. 835.

The managing officers and agents of a corporation have the power to employ attorneys without any express delegation of power and authority to do so. In *Becker v. National Refining Co.*, 50 S. W. (2d) (Mo. App.) 670, it was held that the question whether the secretary and other agents of a corporation had authority to employ counsel to represent the corporation in certain litigation was for the jury; and where there was evidence that the secretary conferred with the attorney respecting the participation of the latter in the litigation, and that the secretary had been sent by the president of the corporation to see the attorney, there was sufficient evidence for the jury to find that the

secretary and other agents of the corporation were authorized to employ the plaintiff as counsel.

In *Negim & Co. v. Harp,* 98 Okla. 261, 225 Pac. 347, it was held that a corporation is estopped to deny the authority of its secretary in employing attorneys to perform services for the corporation where the secretary owned practically all the stock of the corporation, was in charge of its business at the time, and it appeared that the attorneys obtained the approval of the president of the corporation, not as to the employment, but as to things they were doing pursuant thereto, and the corporation received, without objection, the benefit of the services.

In *Kelly v. Ning Yung Benev. Ass'n,* 2 Cal. App. 460, 84 P. (2d) 321, the court, after stating that it was unnecessary for the purpose of making the corporation liable under the circumstances to show that there was a by-law or a form of resolution of its board of directors authorizing its secretary to employ an attorney, held that an attorney who had performed services for a corporation at the request of its secretary was entitled to recovery therefor (apparently on the basis of estoppel), it appearing, as in the case at bar, that the corporation knowingly received such services and enjoyed the benefit thereof.

▮▮▮ Upon the principle that the managing officers and agents of a corporation have the power to employ attorneys to represent the corporation or otherwise to assist in legal proceedings in which the corporation is interested, the general counsel for the corporation has implied power to employ special attorneys or attorneys to assist him in the prosecution of the legal affairs of the corporation, and this authority such general counsel has without any express delegation of power or any formal resolution of the board of directors to that

effect. In so holding in *Dublin & S. W. R. Co. v. Aker-man,* 2 Ga. App. 746, 59 S. E. 10, the court said:

"We are inclined to think that the general counsel or head of the legal department, in a corporation such as this, would have the implied power to employ such special or local attorneys as might be necessary. Certainly the employment of an attorney by the joint authority of the general counsel and the president, who also exercises the duties of superintendent, is to be regarded as the act of the corporation."

In *Northern Pac. R. Co. v. Clarke,* 106 Fed. 794, the division counsel for the Northern Pacific Railway Company employed a special attorney in the state of Idaho to defend the railway company in several cases pending against it. Upon the conclusion of the actions, the railway company refused to pay an attorney's fee to the special attorney employed in Idaho. The employment of the original attorney was general in its character, and amounted to an agency in the legal business of the railway company. In the case at bar, Mr. Weinstein's employment was general in its character and amounted to an agency in the legal business of appellant, in addition to which the subsequent assent on the part of appellant to the employment of respondents is fairly inferable from the facts of the case. The court said, in *Northern Pac. R. Co. v. Clarke, supra:*

"It is elementary law that an attorney in a particular case has no general authority, by virtue of his retainer, to employ other counsel, either by way of substitution or as assistant or associate counsel, at the expense of his client. But where the employment of the original attorney is general in its character, and amounts to an agency in the legal business of the client, or where the authority or the subsequent assent on the part of the client to the employment of additional counsel can fairly be inferred from the facts of the case, the client will be bound by such employment."

■ Mr. Weinstein was secretary, treasurer, and a member of the board of directors of the corporation, in addition to being the general attorney for the corporation; and, as the president of the corporation stated, "all legal matters are left to him and whatever action he takes meets with our approval." Not only did Mr. Weinstein have implied authority as secretary, treasurer, director, and general counsel of and for appellant, but he had express authority, because the corporation, speaking through its president, so testified; and appellant knowingly accepted the arrangements Mr. Weinstein made for respondents' special legal services.

■ Even if the act of Mr. Weinstein in employing respondents was originally unauthorized, that act could become binding upon appellant corporation by a subsequent ratification. 13 Am. Jur. 875. See, also, *Mohr v. Sun Life Assurance Co.*, 198 Wash. 602, 89 P. (2d) 504; and annotation 7 A. L. R. 1446 *et seq.*

The judgment is affirmed.

ROBINSON, C. J., MAIN, and STEINERT, JJ., concur.

DRIVER, J. (dissenting)—Respondents are not entitled to recover from appellant in the absence of a contract of employment. No officer or agent of appellant other than Mr. Weinstein ever made any such contract with respondents. Throughout the litigation that was the basis of their claim, respondents did not do any work or render any service which they would not have had to do and render for their own brewery clients. They did not appear of record as attorneys for appellant. On the pleadings in the superior court, Mr. Weinstein was named as its sole attorney. A joint brief was filed in this court on which all the attorneys for all the breweries were named, it is true; but, surely, that would be no indication that each attorney represented

not only his own client, but also all the other litigants on his side of the controversy as well.

No representative of appellant other than Weinstein had any knowledge that respondents were presuming to act as its attorneys, and there was nothing to put any such representative on notice. In the absence of knowledge, there could be neither a meeting of the minds on a contract of employment nor ratification of an employment attempted by Weinstein. Appellant did not knowingly accept the benefits of services rendered for it by respondents. It was merely an incidental beneficiary of services which respondents rendered for their own clients.

This leads logically to what I regard as the crucial question in the present case: Did Mr. Weinstein have authority to employ respondents as appellant's attorneys? As the majority opinion points out, he was secretary-treasurer and a director of appellant corporation. He was not, however, manager or a managing agent. No by-law or any resolution or other action of the board of directors empowered the secretary-treasurer to retain counsel for the corporation, nor was there any evidence that it was customary for him to do so. If Weinstein had authority to bind appellant, then it must have been by virtue of his position as its attorney. The universally recognized general rule is stated in an annotation in 90 A. L. R. 265, 266, as follows:

"It is well settled that an attorney at law has no implied authority to engage associate counsel and impose upon his client a liability for the fees of such counsel."

The exception to this rule, upon which the majority rely, as exemplified by *Northern Pac. R. Co. v. Clarke,* 106 Fed. 794, that a general counsel may employ other attorneys at the expense of his client, is not applicable here for the simple reason that Mr. Weinstein was not

a general counsel. He was a lawyer engaged in general practice, and appellant was one of his clients. If he were a general counsel within the meaning of the exception to the rule, then so would be every other attorney employed by a corporation or an individual client on a retainer and fee basis.

It seems to me that the majority opinion, in effect, announces the novel doctrine, supported by neither reason nor authority, that one becomes liable to an attorney for fees merely by reason of the fact that he is interested in the result of a case in which the attorney's client is a party, and accepts, without objection, the incidental benefit of legal services which extends alike to all persons interested in the litigation. I, therefore, dissent.

[1] Reported in 126 P (2d) 1083.