209 P.2d 899

**FELTON v. FINLEY et al.**

**No. 7426.**

Supreme Court of Idaho.

Jan. 6, 1949.

On Rehearing June 24, 1949.

Rehearing Denied Oct. 8, 1949.

See, also, 68 Idaho 412, 195 P.2d 360.

Estes & Felton, of Moscow, and Wm. S. Hawkins, W. F. McNaughton, and H. S. Sanderson, all of Coeur d'Alene, for appellants.

J. H. Felton, of Lewiston, and Hamer Budge, of Boise, for respondent.

GIVENS, Justice.

March 1944, Seigle Finley and W. E. or William Finley, two of the three surviving nephews of Seigle Coleman, who died

testate December 4, 1943, employed respondent to contest the deceased Coleman's will, which was successfully done. In re Coleman's Estate, 66 Idaho 567, 163 P.2d 847. At that time respondent told Seigle and William Finley that he would accept the employment only on condition that the other nephew and brother, Orval Finley, and the three sisters, Ida Davis, Nan Holder, and Rose Finley Nichles, likewise employ respondent as their attorney and that all six of the heirs participate in the contest.

Respondent requested Seigle and William Finley to contact their brother and sisters and secure signed contracts of employment similar to the ones which Seigle and William signed; namely, on a 50% contingent basis. Respondent likewise wrote the other four heirs requesting their execution of such contracts. Such heirs never replied to respondent's initial letter or to subsequent letters written by him continuing to request their execution of such contracts of employment and advising them as to the course of the litigation.

Seigle and William Finley contacted two sisters, Nan Holder and Ida Davis in Pilot Rock, Oregon, with reference to their joining in the employment of respondent and related that:

"* * * they said they would have nothing to do with it. My oldest sister, Ida Davis, is very religious and she said she didn't feel like protesting. She said, 'What you boys do is your business, but I will have nothing to do with it.'"

"Q. Did they, the two sisters, make any statement that they would not oppose the contest? A. The only statement they made was they would have nothing to do with it one way or the other."

Testifying further that they (Seigle and William Finley) attempted to get the three sisters and the other brother to join with them—that is, in the employment of respondent in the prosecution of the contest, stating further:

"A. I had quite a time contacting my brother (Orval). He was in Alaska part of the time and I called him in St. Paul, Minnesota, that's his home, and he said, 'I am having nothing whatever to do with a dead man's money.'"
and that he (Orval),

"* * * would have nothing to do one way or the other, what I did was my business, to forget about him."
and about the same as to Rose Finley Nichles:

"She said she would have nothing to do with the estate. She said, 'If you and Bill sign, that's your business. I am not going to. There is no use sending the contract.' I read it to her over the phone and she said, 'No.'"

Respondent testified he understood from Seigle and William, that while the other brother and sisters said they would have nothing to do with it, they would leave the further handling of the matter to Seigle and William and he prosecuted the action

on that basis, though Seigle testified he told respondent:

"I told him I couldn't get in touch with them and they wouldn't sign and would have nothing to do with it."

William Finley testified with regard to the conference with the two sisters as follows:

"A. * * * When they came we talked about the contract and breaking the will and my sisters were very much opposed to breaking the will or having anything to do with it, and we talked quite a while and I finally asked them if they would not fight us if we went ahead.

"Q. Not fight you? A. That's right, and they said they wouldn't oppose us, but would have nothing to do with breaking the will. One of my sisters thinks it is a terrible sin.

"Q. Did you have copies of the contract for the signature of Nan Holder and Ida Davis? A. We did.

"Q. Were you able to get them to sign them? A. They would not.

"Q. You advised Mr. Felton that you were unable to get those contracts signed? A. Yes, sir."

Mrs. Holder testified that when she was in Missouri, she followed the case in the Moscow newspapers and knew respondent was representing Seigle and William and admitted she had received one letter from respondent, but not the others. The other sisters and brother did not testify.

At the conclusion of the contest action, distributive checks were made out to each one of the six heirs jointly with respondent for their respective shares, which the three sisters and Orval refused to accept, taking the position they had never employed respondent and were not obligated to pay him any fee and subsequent conferences between respondent and Mrs. Holder were unavailing.

The present suit to establish the implied contract and to enforce the attorney's lien, resulted with findings, conclusions and decree there was an implied contract of employment, from which decree the present appeal was taken.

By stipulation, the appellants have been paid their distributive shares less the portion thereof claimed by respondent and decreed to him as his fee from them.

These facts are established by the record without dispute: that respondent wrote the appellants to the effect he had been employed by their two brothers and he desired their co-employment; that he wrote them of the progress of the litigation and that they refused to sign the contracts and did not answer his letters; that at least one of them had actual notice of the progress of the litigation and being a matter of public record, and they being parties to the Probate proceedings, regardless of the contest because they were devisees under the will, they all had constructive notice of the proceedings; and that they did not repudiate respondent's appearing for them; that though

appellants did not affirmatively participate in the contest, they did not resist and immediately upon the contest being successfully concluded, claimed the additional shares in their Uncle's estate which had been made available to them by the prosecution of the suit and respondent's services in connection therewith, which resulted in benefits to the appellants, together with the two brothers who did actually employ him.

While there are authorities to the contrary, Rives et al. v. Patty et al., 74 Miss. 381, 20 So. 862, 60 Am.St.Rep. 510, this case is at least weakened by Collins v. Schneider, 187 Miss. 1, 192 So. 20, at page 23. O'Doherty & Yonts v. Bickel, 166 Ky. 708, 179 S.W. 848, Ann.Cas.1917A, 419, and Pepper v. Pepper, 98 S.W. 1039, 30 Ky. Law Rep. 460, both recognized there might be an implied contract to pay for services.

It is an elementary rule that, whenever services are rendered and received, a contract of hiring or an obligation to pay what they are reasonably worth will generally be presumed. 28 R.C.L. 668, § 3." Hartley v. Bohrer, 52 Idaho 72, at page 75, 11 P.2d 616, 617.

The rule applicable to the above situation has been recently declared in a Washington case to be as follows:

"The rule is well established that the acceptance of the services rendered by an attorney may raise an implied promise to pay therefor, which will supply the place of a contract of employment. If an attorney renders valuable services, as in the case at bar, to one who has received the benefit thereof, a promise to pay the reasonable value of such services is presumed unless the circumstances establish the fact that such services were intended to be gratuitous." (Citing authorities.) McKevitt v. Golden Age Breweries, 14 Wash. 2d 50, 126 P.2d 1077, at page 1081; Thomas v. Lewman, 190 Okl. 37, 120 P.2d 341.

The record herein affirmatively and positively shows the respondent was not undertaking the services herein for anyone gratuitously. It is also held the acceptance of benefits must be voluntary, O'Doherty & Yonts v. Bickel, supra. The acceptance and receipt by appellants of their share of their enhanced inheritance were entirely voluntary, because there is no law which required them to accept the greater amount; they could have taken only the $500.00 which the will initially gave them and refused the additional sum. Whatever scruples or feelings they had about not signing contracts, taking a dead man's money or interfering with his will, had thus evidently disappeared when the money was made available to them, even though without their active participation. Nevertheless, it was solely through respondent's efforts and successful prosecution of the contest case which procured this additional money for them and which, when thus secured to them by respondent's services, they promptly demanded and have pocketed.

Such course of conduct on their part amounts to such ratification and recognition

of respondent's actions as to create in law an implied contract of employment and fully justified the decree in respondent's favor. Morning Star Mining Co. v. Williams, 171 Ark. 187, 283 S.W. 354.

There is no conflict in the evidence as to the reasonableness of respondent's fee.

The decree is, therefore, affirmed. Costs awarded to respondent.

FEATHERSTONE and TAYLOR, District Judges, concur.

HOLDEN, Chief Justice (dissenting).

December 4, 1943, Seigle Coleman died testate. By will he bequeathed $5,000 to Wilbur Coleman and $500 each to certain nieces and nephews, and the remainder of his estate to certain charitable organizations. The will was later offered and admitted to probate. Thereafter, two of the three surviving nephews, Seigle Finley and William Finley, entered into a contract with respondent Felton by which they agreed to pay Felton one-half of all benefits which might be obtained by virtue of a contest of the will. One nephew, Orval Finley, and three nieces, Ida Davis, Nan Holder and Rose Finley Nichles, refused to sign identical contracts or to have anything to do with the contest or the employment of respondent. Then followed a contest of the will in the probate court. That court held the will to be validly executed, but held the clauses attempting to bequeath and devise part of the property to different institutions were void because the institutions were charitable and the will had been executed less than thirty days prior to the decease of Seigle Coleman. An appeal was taken to the district court. That court decreed the will was valid and properly executed; that the clauses attempting to devise the property to charitable organizations were void; that the will should be enforced as to the specific bequests other than those to the charitable institutions, and the balance of the property should be distributed to the heirs of Seigle Coleman; that inasmuch as Seigle Coleman had left no father, mother, wife, brothers or sisters, the property should be distributed in equal parts to the heirs of the deceased brothers and sisters, who are nephews and nieces of Seigle Coleman, deceased. Upon appeal (In re Coleman's Estate, 66 Idaho 567, 163 P.2d 847, decided November 21, 1945) the district court was affirmed.

Thereafter, to-wit, February 9, 1946, respondent filed in the probate court of Latah county in the Matter of the Estate of Seigle Coleman, deceased, a notice and claim of "lien upon the distributive shares of such persons [appellants and Orval and William Finley] as heirs of the late Seigle Coleman." And on said last mentioned day decree was rendered and entered in said matter whereby it was adjudged and decreed, among other things, that respondent had a lien for attorney fees upon the distributive shares of appellants from which appellants appealed to the district court of

Latah county March 9, 1946. While the said appeal was still pending in said district court, and before it had been disposed of, a written stipulation was entered into between respondent and counsel for appellants, that the question involved in such appeal was "whether or not J. H. Felton [respondent] had a lien" on the distributive shares of appellants, "and, if so, the amount thereof, and no other issue." For the purpose of having that question determined without delay it was further stipulated that an independent action be brought by respondent, the parties agreeing upon the exact form and substance of both the complaint and answer in such action, a copy of each being attached to the stipulation.

The complaint and answer were later filed pursuant to such stipulation and the cause tried June 12, 1947. After the trial, but before findings were made, the parties mutually agreed appellants, respectively, might then be paid the benefits arising from the contest of the will without waiting for the outcome of the controversy between respondent and appellants. The trial court then found and held the acceptance of such benefits created an implied contract to pay respondent attorney fees.

It is urged in the case at bar that where one permits another to perform services for him, the law raises an implied promise to pay the reasonable value of the services. But respondent does not bring himself within the rule. Here, appellants, notwithstanding several efforts were made to induce them to employ respondent, refused to do so. It is true respondent performed services in contesting the will, but the services were performed for "S. P. Finley [Seigle]" and William Finley under the terms of a written contract. He was thus obligated to perform all the services he performed. He could not repudiate his solemn contract without committing a breach. Nor was respondent expected by those who thus employed him to perform such or any services gratuitously. The contract which respondent himself drew provided for the payment of the compensation which he thought his services were worth. The benefits which came to appellants were the result of the performance of the terms of the written contract entered into by respondent with Seigle and William Finley, not the result of any contract with appellants, because they refused to employ him. And, further, the services respondent performed in contesting the will were performed with knowledge appellants would not employ him. In fact, appellants were opposed to the contest and would not, and did not, have anything to do with it. No case has been cited and none can be found holding an implied promise or implied contract to pay for services under such facts and circumstances. Nor does Morning Star Mining Co. v. Williams, 171 Ark. 187, 283 S.W. 354, hold that a set of facts such as above stated creates an implied contract of employment. It is true that was a case to recover attorney fees on an implied contract to pay. But in that case it appears

Williams, an attorney, accepted employment in good faith to prosecute a suit to remove a cloud upon the title to certain real property, believing that one Chase was authorized to employ him. Chase had previously employed him for the Morning Star Mining Company and the company had regularly paid the fees. No such showing was made in the case at bar. Appellants never had employed respondent. Not only that, they refused to employ him and, further, they never conferred with him or encouraged him to contest the will. It is at once apparent the Morning Star case, supra, is not in point.

But it is argued the acceptance of accruing benefits created an implied contract to pay respondent. In resolving that question the above stated facts of this case should be kept in mind. The courts are unanimous in holding an acceptance of benefits does not create an implied contract to pay.

In O'Doherty & Yonts et al. v. Bickel et al., 166 Ky. 708, 179 S.W. 848, Ann.Cas. 1917A, 419, a case quite similar in its facts to the case at bar, the court held:

"As a general rule, an attorney cannot recover fees for his services from one who has not employed him or authorized his employment, although the services may have been beneficial to such person."

To the same effect: Rives et al. v. Patty et al., 74 Miss. 381, 384, 20 So. 862, 60 Am. St.Rep. 510; Pepper v. Pepper, 98 S.W. 1039, 30 Ky.Law Rep. 460; In re Faling's Estate, 113 Or. 6, 228 P. 821, 231 P. 148.

The judgment should be reversed and the cause remanded with directions to dismiss the action.

SUTPHEN, District Judge, concurs in this dissenting opinion.

### On Rehearing

HOLDEN, Chief Justice.

 A rehearing was had at Lewiston at our May, 1949, term. Since such rehearing the various contentions of the respective parties have been fully and carefully re-examined. We conclude, as a result of such re-examination, that the decree appealed from in the case at bar should be, and it is hereby, reversed and the cause remanded with directions to dismiss the action, in accordance with the views expressed in the foregoing dissenting opinion of Chief Justice Holden. Costs awarded to appellants.

TAYLOR, J., and FEATHERSTONE and SUTPHEN, District Judges, concur.

GIVENS, Justice (dissenting on rehearing).

Appellant, on rehearing, urged that Chandler v. Washington Toll Bridge Authority et al., 17 Wash.2d 591, 137 P.2d 97, in effect overcomes McKevitt v. Golden Age Breweries, 14 Wash.2d 50, 126 P.2d 1077, heretofore relied upon.

Not only an independent analysis of Chandler v. Washington Toll Bridge Au-

thority et al., supra, but also the conclusion and interpretation placed upon it by subsequent decisions of the court, show it is not applicable to the situation herein, because it did not consider and was not based upon an implied contract.

"Appellant does not rely upon any contract implied in fact. Indeed, his complaint contains no allegations which could be construed as alleging the existence of any such contract. None of his allegations warrants even an implication that appellant rendered services at respondent's request, or rendered any such services with any idea that respondent would pay him therefor. His sole contention is that the allegations of his complaint show that respondent is liable to him upon a quasi contract.

"In the case of Byram v. Thurston County, 141 Wash. 28, 251 P. 103, 107, 252 P. 943, this court, in discussing the nature of quasi contracts, said: 'A contract implied in law is an obligation imposed upon a person by the law, not in pursuance of his intention and agreement, either express or implied, but found against his will and design, because the circumstances between the parties are such as to render it just that one should have a right and the other a corresponding liability similar to that which would arise from a contract between them. This kind of obligation rests upon the principle that whatsoever it is certain a man ought to do, that the law will suppose him to have promised to do.'"

Chandler v. Washington Toll Bridge Authority et al., supra [17 Wash.2d 591, 137 P.2d 101].

In the case at bar, the court expressly found and the record clearly shows the case was so presented and considered thus:

"That there exists between the plaintiff and the defendants here an implied contract by the defendants authorizing and directing the plaintiff to appear for and on behalf of said defendants and each of them for a consideration of fifty per cent of the net recovery in said litigation, and that plaintiff has a lien on the funds so recovered for his attorney's fees in said cause."

Thus, Chandler v. Washington Toll Bridge Authority et al. really supports the conclusion heretofore reached herein.

This construction of the above case on this point is borne out in Western Asphalt Co. v. Valle, 25 Wash.2d 428, 171 P.2d 159, at page 164:

"Appellant relies upon the case of Chandler v. Washington Toll Bridge Authority, 17 Wash.2d 591, 137 P.2d 97. The facts in the case cited differ so greatly from the facts contained in the record before us that the case is not here in point. In the Chandler case the plaintiff, seeking to hold the defendants liable to him, relied largely upon the doctrine of unjust enrichment; while in the case at bar respondent contends that it should recover upon a contract implied in fact.

\* \* \* \* \* \*

" '(§ 9) F. Acceptance of, or Assent to, Services—1. In General. Irrespective of a precedent request, where beneficial services or valuable materials have been rendered and accepted, the law will ordinarily imply a promise to pay their reasonable value, the intent to pay being found as a part of the agreement. In other words, the acceptance of valuable services and materials raises a presumption of intent to pay, or that the services were to be compensated, or a presumption of legal liability, and, while such presumption is not conclusive, it is sufficient to throw upon the person contesting liability the burden of showing an agreement or other circumstances indicating that the services were to be gratuitous. * * *'

"The foregoing statements are supported by 1 Williston on Contracts (Revised Edition), §§ 36 and 36A, pp. 93 to 98; 3 Page on the Law of Contracts, 2d Ed., § 1442, p. 2466, § 1444, p. 2470, § 1445, p. 2470, § 1446, p. 2472; 6 R.C.L., title, Contracts, § 6, pp. 587, 588.

* * * * * *

"Again, it is not necessary that the defendant should have believed that the plaintiff expected pay. If as a reasonable man he should have understood from what he knew that such was the expectation, he would be bound by accepting the services. Day v. Caton, 119 Mass. 513, 20 Am.Rep. 347. * * *"

With like import is Christie v. Port of Olympia, 27 Wash.2d 534, 179 P.2d 294, at page 302.

These additional authorities cited by respondent support the affirmance of the judgment herein: Emerson v. Superior Court, 29 Cal.App. 539, 84 P.2d 1059, at page 1061; Young et al. v. Bruere et al., 78 Cal.App. 127, 248 P. 301, at page 302, Central Railroad & Banking Co., v. Pettus, 113 U.S. 116, 5 S.Ct. 387, 392, 28 L.Ed. 915, at page 919:

" * * * The creditors who were entitled to the benefit of the decree had only to await its execution in order to receive the full amount of their claims; and that result was due to the skill and vigilance of the appellees, so far as the result of litigation may, in any case, be referred to the laborers of counsel. When creditors filed their claims they had notice, by the bill, that the suit was brought, not exclusively for the benefit of the complainants therein, but equally for those of the same class who should come in and contribute to the expenses of the litigation. Those expenses necessarily included reasonable counsel fees, which, upon every ground of justice, should be estimated with reference as well to the claims of the complainants who undertook to protect the rights of all the unsecured creditors, as of the claims of those who accepted the fruits of the labors of complainants and their solicitors. We are of opinion that the appellees are entitled to reasonable compensation for their professional services in establishing a lien in behalf of the unsecured creditors of the

Montgomery & West Point Railroad Company, upon the property described in the suit instituted by Branch, Sons & Co., and others, * * *."

The judgment should be affirmed.