698 P.2d 335

**STATE of Idaho, Plaintiff-respondent,**

v.

**Randall W. BAINBRIDGE,
Defendant-appellant.**

**No. 14544.**

Supreme Court of Idaho.

March 14, 1985.

Stewart A. Morris, Boise, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-respondent.

1984 OPINION NO. 65, ISSUED JUNE 21, 1984, IS HEREBY WITHDRAWN, AND THIS OPINION IS SUBSTITUTED THEREFOR.

BAKES, Justice.

Appellant was tried and convicted of first degree murder (felony murder, murder during the commission of a robbery) and robbery and was sentenced to two concurrent fixed life sentences. He appeals both his conviction and his sentence. For the reasons set out below, appellant's conviction must be reversed and the cause remanded for a new trial. Additionally, we address other issues which deal with appellant's conviction and which might arise as issues upon retrial.

I

The facts of the crime committed in this case are the same as those in *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983). Appellant was Sivak's co-defendant. The two were tried at separate trials, before different judges.

On April 6, 1981, a cashier at a local gas station was murdered, and the station was robbed. The victim was shot several times and stabbed numerous times. She was found, still barely alive, by two customers. When she was found, her sweater and bra were pulled up, exposing her breasts.

Several witnesses came forward with information concerning the crime after an appeal for such information was broadcast in the local news media. These witnesses included two, Gary Chilton and Gloria Leyden, who had stopped at the station before the murder and observed two men inside the station. These two witnesses were hypnotized by an investigator to aid their recall of the details of what they observed.

On April 8, 1981, two days after the crime, Sivak was interviewed by police. He admitted that he and appellant had been at the station, but saw nothing. Detectives then contacted appellant. He was asked to sign a waiver of rights form, but refused, and requested a meeting with his parole officer. He was then taken to the law enforcement building where he did sign a rights waiver form. He was then interviewed on tape. At first appellant denied any involvement in the crime, but later told detectives that he and Sivak had stopped by the station to get cigarettes on the way to repair appellant's van and, while there, Sivak alone robbed and murdered the victim.

Appellant and Sivak were then arrested and a warrant issued for search of a storage area rented by Sivak. Many incriminating items were found. The following day, on April 9, appellant was again interrogated and made a second statement. Appellant later filed motions to suppress both the first and second statements, and the items seized pursuant to the warrant. The trial court granted the motion to suppress the second statement because appellant had been denied his right to counsel, but denied the other motions.

A great deal of publicity surrounded appellant, his co-defendant, and their separate trials. Publicity was especially heavy around the time of Sivak's trial, which took place several weeks before appellant's and resulted in Sivak's being found guilty of first degree murder. Appellant moved for a change of venue, but the motion was denied. The trial court did issue an order stating that in the event an Ada County jury could not be selected in three days, jurors would be selected from Nez Perce County. However, an Ada County jury was finally selected.

At trial, the prosecutor was allowed to pursue a sexual motivation theory, over the strenuous and continuing objections of defense counsel. The prosecution introduced evidence of the fact that the victim's sweater and bra were pulled up, exposing her breasts; that appellant made statements to two others after the murder that the victim "really turned him on"; and also attempted to introduce testimony of appellant's prior sexual misconduct through testimony of illicit relationships with a girlfriend and cohabitation with his wife before marriage. The prosecution was also allowed to introduce evidence of the good character of the victim, and her plain appearance, inferring that she would not have encouraged appellant. The prosecution cross examined appellant's character witnesses concerning the possibility of any sexual misconduct. The prosecution was also allowed to argue this theory to the jury.

Appellant's primary allegation of error is that the testimony of the two witnesses whose memories were hypnotically refreshed should not have been admitted. The parties have extensively briefed and argued the issue of hypnotically refreshed testimony and urge the adoption of a new rule. In our recent case of *State v. Iwakiri*, 106 Idaho 618, 682 P.2d 571 (1984), this Court did adopt such a rule to be followed by Idaho trial courts in admitting such testimony. On the face of this record, and judging admissibility of the testimony by the standards established in *Iwakiri*, it appears that at least a portion of the hypnotically refreshed testimony in this case may have been improperly admitted. On this basis, we find it necessary to reverse appellant's conviction, to allow for a new trial using only that testimony which the trial court determines is admissible under the rules established in *State v. Iwakiri, supra*.

Appellant alleges numerous other errors occurred at trial. We consider these other errors to give the trial court guidance upon retrial of this case. First, he urges that the trial court erred in failing to suppress the first statement made by appellant to authorities on April 8, and the items seized pursuant to a search warrant based upon information obtained in the April 8th interrogation. Appellant asserts two reasons the April 8th statement should have been suppressed. First, he claims that he requested an attorney before the interview, and one was not provided; thus, the statements should be suppressed as taken in violation of his sixth amendment right to counsel. Also, appellant argues that the rights waiver form signed by appellant on April 8th was not effective to waive his constitutional rights because he was not fully cognizant of those rights due to coercive techniques used by the interrogators and appellant's own mental condition. In other words, appellant argues that he did not voluntarily, knowingly and intelligently waive his constitutional rights.[1]

1. The trial court excluded the April 9th statement because it was clear that appellant had

requested counsel, and counsel had not been provided. This was a correct ruling in that the

However, the trial court, after taking testimony, ruled that the April 8th statement was admissible. In a written opinion, the trial court ruled that the defendant did not request an attorney on April 8th, so no violation of the right to counsel occurred. In addition, the trial court stated that:

"After examining the totality of the circumstances surrounding the statements which defendant made at that time, as required by *State v. Padilla,* 101 Idaho 713, [620 P.2d 286] (1980), it appears that the defendant's statements were voluntarily made."

He also ruled that the waiver was knowingly and intelligently made.

■ A factual dispute over whether appellant actually requested counsel on April 8th was resolved against appellant by the trial court after hearing all the testimony. The trial court's decision that no right to counsel was asserted is supported by evidence in the record, including testimony of both state investigators who testified that no mention of counsel was made, and by the testimony of appellant's girlfriend (now wife) who never mentioned that appellant requested an attorney, only that he wanted to talk with his parole officer. *See Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) (request for probation officer not *per se* violation of fifth amendment rights). Because the trial court's finding on this issue is supported by substantial evidence, it will not be disturbed.

Appellant also argues that any waiver of his rights was not made voluntarily. He cites what he terms coercive tactics by the investigator and his own low normal intelligence as evidence that a possibility of coercion exists. He also asserts that any waiver was not knowingly or intelligently made, and again cites his own mental capacity in support of this allegation.

United States Supreme Court has ruled in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), that an invocation of the right to counsel must be scrupulously honored, and once the right is invoked, all questioning must cease until counsel is provided or the defendant initiates further communication.

■ We first note that the state has a heavy burden in overcoming a presumption against the waiver of constitutional rights. *State v. Mitchell,* 104 Idaho 493, 660 P.2d 1336 (1983), *cert. den.* 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308. However, an express written statement of waiver, although not conclusive, is strong evidence of the voluntariness of the waiver. *State v. Mitchell, supra; State v. Padilla,* 101 Idaho 713, 620 P.2d 286 (1980). In this case, appellant was advised of his rights and signed a written statement of waiver before his interrogation on April 8th. Appellant then talked with officers, but made no incriminating statements until his parole officer arrived. After his parole officer arrived, he made a statement to officers fully indicating his version of the events, and his observations of the robbery and killing. In other words, there was a strong indication in the record that appellant was more than willing to talk as long as his parole officer was present. There was also evidence that appellant had previously been involved with the criminal justice system, and thus had previously been made aware of his rights. We thus conclude that appellant voluntarily waived his constitutional rights, as the trial court correctly ruled. *See Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966) (reviewing court must make independent determination on the voluntariness issue). *State v. Fisk,* 92 Idaho 675, 448 P.2d 768 (1968).

■ Appellant also argues that the trial court erred in denying a motion for change of venue. He argues that extensive pretrial publicity, especially around the time of the trial of co-defendant Sivak several weeks before appellant's trial, so tainted the proceedings that a fair and impartial jury could not be obtained. We first note that the decision to grant or deny a change

The state does not challenge the exclusion of the April 9th statement in the trial court's initial ruling. However, we note that the April 9th statement was admitted into evidence, and played to the jury, because it was offered by defense counsel during *his* case in chief.

of venue is within the discretion of the trial court. As we noted in *State v. Thomas*, 94 Idaho 430, 489 P.2d 1310 (1971), "[W]here it appears that the defendant actually received a fair trial and that there was no difficulty experienced in selecting a jury, refusal to grant a change of venue is not a ground for reversal." *Id.* at 432, 489 P.2d 1310. *See also State v. Cypher*, 92 Idaho 159, 438 P.2d 904 (1968); *State v. McKeehan*, 91 Idaho 808, 430 P.2d 886 (1967).

■ We have previously considered factors we will examine in determining whether an abuse of discretion occurred.

"This Court has held on many occasions that the decision to grant or deny a change of venue rests within the sound discretion of the trial court. *State v. Powers*, 96 Idaho 833, 537 P.2d 1369 (1975); *State v. Thomas*, 94 Idaho 430, 489 P.2d 1310 (1971); *State v. Bitz*, 93 Idaho 239, 460 P.2d 374 (1969); *State v. Cypher*, 92 Idaho 159, 438 P.2d 904 (1968) .... Among the factors which this Court will consider in determining whether a criminal defendant actually received a fair trial are affidavits indicating prejudice or an absence of prejudice in the community where the defendant was tried, testimony of the jurors at voir dire as to whether they had formed an opinion of the defendant's guilt or innocence based upon adverse pretrial publicity, whether the defendant challenged for cause any of the jurors finally selected, the nature and content of the pretrial publicity, and the amount of time elapsed from the time of the pretrial publicity to the trial itself. *See, e.g., State v. Bitz, supra.* Publicity by itself does not require a change of venue. *Id.*" *State v. Needs*, 99 Idaho 883, 890, 591 P.2d 130, 137 (1979) (footnotes omitted).

In this case the trial court was faced with the possibility of a change of venue, and indicated its desire to empanel a fair jury by issuing an order stating:

"[I]t is uncertain whether a jury to try such case can be selected from an Ada County venire, due to extensive pre-trial publicity, although the Court has heretofore decided that a fair effort should be made to obtain an impartial jury from the regular Ada County venire before further considering a change of venue; and

"... if it becomes apparent that an impartial jury cannot be selected to try the defendant from the regular Ada County venire, and in preference to completely changing the venue of the trial, the parties have assured the Court that they would desire and agree that a jury may be selected in Nez Perce County, and such selected jury moved here to Ada County to try said defendant ...."

Thus, the trial court recognized the possibility that pretrial publicity might taint the jury panel. However, the selection of a jury from Nez Perce County became unnecessary when a jury was selected from Ada County without significant difficulty. In answer to preliminary questions from the court, it appears that most of the jury panel had heard about the case.[2] However, in individual questioning, most of the jurors indicated their recall of the facts was very vague. Of the twelve jurors and two alternates finally selected, all had some recall of the facts of the case, but their recall was very vague at best. None of these jurors were challenged for cause. In addition, defense counsel did not exercise all the peremptory challenges available to him. All of the jurors finally selected indicated that they had formed no opinion, and could set aside anything they had heard and base their verdict only on the evidence presented at trial. In addition, the nature of the pretrial publicity indicates that most of the reports consisted of factual accounts of the events surrounding the crime and the trial of appellant's co-defendant. There is very little to indicate that the pretrial publicity included editorial opinions or was

---

2. Of the panel of 125 jurors, 113 indicated that they had read or heard about the case. Upon retrial, the attenuation between the extensive publicity and the time of trial should be much greater, so that the task of securing jurors without bias or even knowledge of the case should be easier.

likely to inflame passion or prejudice of potential jurors. For all of these reasons, we see no error in the refusal of the trial court to grant a change of venue.

We have also considered appellant's allegation that the prosecutor was improperly allowed to pursue a sexual motivation theory. Throughout the course of appellant's trial, the trial court allowed the prosecutor to ask questions to establish a sexual motivation for the murder. Basically, the prosecutor was attempting to prove that appellant participated in the crime involved because of a sexual fantasy that he had concerning the victim. There were several items of evidence introduced upon which the prosecutor based his sexual motivation theory. These items do tend to prove a sexual motive for the crime and to connect the defendant with the crime. These items were (1) that the victim was found with her sweater and bra pulled up, exposing her breasts, and (2) that appellant made statements two days following the crime to two employees of the gas station while making a donation to a fund set up for the victim's family that the victim "really turned him on," and (3) statements appellant made to investigators during his interrogation to the effect that he liked the victim, that he would "get to bump into her," that it "didn't bother her when I'd bump into her or touch her," that he had previously on occasion "swatted her on the butt," and "I wanted to make love to ... that lady." These items of evidence were relevant to show that sex was a possible motive for the crime and to connect the defendant with the crime. Much of the other evidence used by the prosecutor to support the sexual motivation theory, however, had little relevance to the sexual motive and was highly inflammatory and highly prejudicial. Much of this evidence served merely to cast the appellant in a bad light.

■ Generally, evidence of unrelated criminal or immoral activity on the part of a defendant is inadmissible at trial. *State v. Needs, supra; State v. Wrenn,* 99 Idaho 506, 584 P.2d 1231 (1978). *See also U.S. v. Burns,* 529 F.2d 114 (9th Cir.1975). However, evidence of a defendant's past activities may be admissible to prove motive, or any of a number of other similar issues outlined in our prior cases. *State v. Needs, supra; State v. Wrenn, supra; State v. Crawford,* 99 Idaho 87, 577 P.2d 1135 (1978). In view of the fact that the condition of the victim's body at the time it was found indicated the possibility of a sexual attack, evidence of the defendant's conduct which would tend to show that appellant had such a sexual motive to commit the crime would certainly be admissible on the issue of his motive to commit this particular crime. Thus, evidence that appellant made statements indicating that the victim "turned him on," and made statements that he was sexually attracted to the victim were admissible under this exception to the general rule of inadmissibility.

However, the references to the possible sexual motive in this case seemed to venture beyond the scope of this admissible evidence. References to appellant's personal sexual habits, introduced in an attempt to bolster the prosecutor's theory that this crime was sexually motivated, were marginally relevant, and their prejudicial effect seemingly outweighed any possible relevance to the relationship between appellant and the victim, and permeated the entire trial. Upon retrial, the trial court should take care to avoid admission of evidence dealing solely with appellant's personal sexual habits, and not tending to connect appellant with the commission of this particular crime.

The prosecution made the sexual motive theory a major part of its case. In his opening argument, the prosecutor indicated to the jury his theory that the crime was sexually motivated and indicated his intent to "introduce evidence involving Mr. Bainbridge linking him with some sexual matters in this case." He also indicated that he would prove that appellant was living with a woman at the time of the crime and that appellant "had a number of other girl-friends besides" the woman he was living with. He named one of those women, Mary Garcia, and indicated that she was

appellant's paramour. In his case in chief, the prosecutor, before ever attempting to prove that a crime had been committed, emphasized the fact that appellant was living out of wedlock with his girlfriend at the time of the commission of the crime, by questioning his brother's girlfriend. Then, again prior to any proof that a crime had been committed, the prosecutor called to the stand Mary Garcia, whom appellant had been seeing at the time he was living with his other girlfriend. Before any testimony was elicited, the defendant's attorney objected to the prosecutor asking any questions about the illicit sexual relationship between appellant and Mary Garcia. After a discussion of this question, appellant's attorney asked the trial court, "Is it your ruling now that you are going to allow Mary Garcia to testify to an illicit sexual relationship between my client and herself?" The court replied in the affirmative, and appellant's attorney noted his objection. The prosecutor then called Mary Garcia and proceeded to ask questions concerning the nature of the relationship.

"Q. [By the prosecutor] What was the nature of your relationship with [appellant]?

"A. We were very good friends.

"Q. Sexually were you very good friends?

"A. We had sexual encounters."

A few minutes later, the prosecutor delved even more deeply into these matters:

"Q. Now, I want you to describe to the Jury, in terms of Randy approaching you sexually, how would he approach you in terms of touching or that type of thing?

"A. Your Honor, do I have to answer these questions?

"THE COURT: Yes, you do.

"THE WITNESS: Yes. All right, he was just normal. Just as if—well, normal like any man would approach a woman.

"Q. BY MR. HOWEN: Would he touch you, your body?

"A. Well, I don't know how to explain it.

"Q. I know it's perhaps not—

"A. I mean, good Lord—

"Q. Okay—

"A. —it's just normal like any other normal man would do.

"Q. You and I have already discussed this in detail; have we not?

"A. True.

"Q. Okay.

"A. I mean, if I was washing the dishes, maybe he might come behind me and put his arm around me, you know, give me a kiss on my cheek.

"Q. And then what?

"A. Well, nothing. I'd just say 'go on, I've got the dishes.'

"Q. Would he ask or request sex from you?

"A. Well, yeah, sometimes.

"Q. Did you turn him down more often than not?

"A. Sure.

"Q. Was he persistent?

"A. Persistent by demanding? No.

"Q. Yes. If you said 'no' would he come back in 10, 15 minutes, half hour, next day; anything along that line?

"A. Well, maybe 2, 3 hours later when I got done with the dishes or whatever I'd have to do. He'd ask again or I might turn around and ask him.

"Q. Was this something involved with—well, was the touching of your person connected with the request; or was it something unrelated as far as you recall?

"A. Sometimes it would be both ways. It just depended, you know, no set pattern."

The nature of this questioning was such that it elicited highly irrelevant, yet highly inflammatory evidence.

The trial court also allowed the prosecutor to delve into sexual matters during his cross examination of appellant's witnesses. Of appellant's cousin the prosecutor asked, "Did [appellant] like to try to touch you very much physically?" and "didn't [he] try to touch you in inappropriate places?" Of a friend of appellant's family, the prosecutor asked, in reference to a comment by the witness that appellant was a loving and

considerate person, "Was he loving in the sexual sense between a man and woman?" and "never tried to touch you inappropriately?" Of appellant's aunt, the prosecutor inquired whether she was aware of appellant having girlfriends after he got married. He also asked, "Would you be particularly surprised if he did have a number of girlfriends in a sexual context?" This question was obviously intended to give the jury the impression that appellant was sexually promiscuous, whether married or not, although the only "girlfriend" that the prosecutor ever produced was Mary Garcia. The prosecutor emphasized the infidelity idea by asking appellant's aunt, "I take it you don't think that's particularly different if someone's married or living with someone to have other girlfriends in a sexual context," to which the aunt replied, "I'd say it wouldn't be right." The prosecutor then said, "But that wouldn't surprise you about Mr. Bainbridge?", to which the aunt replied, "Well, when he was married I don't know that he did."

█ The prosecutor, by his actions in placing appellant's sexual behavior in a prominent position in his case, exacerbated the possible prejudicial effect of any erroneous evidence admitted. Where inflammatory evidence such as this is placed before the jury in such a light and serves no probative function, it tends to have the effect of disparaging appellant's character, thus serving "to inflame the minds and passions of the jury to the prejudice of the defendant." *State v. Wilson*, 93 Idaho 194, 457 P.2d 433 (1969). Upon retrial, the trial court can reduce the possibility of tainting the trial by strictly controlling the order of proof and, while still allowing the prosecutor to pursue his theory through evidence concerning the crime itself, and evidence tending to connect the defendant with the crime, at the same time avoiding evidence which solely illustrates the defendant's personal sexual habits or behavior, thus assuring appellant a fair trial.

Reversed and remanded for new trial.

DONALDSON, C.J., and SHEPARD and HUNTLEY, JJ., concur.

BISTLINE, Justice, concurring in part and dissenting in part.

## ANENT A MATTER OF PROCEDURE

Although counsel involved will know, the trial bar at large will not know, that the opinion for the Court which will be found in the Idaho Reports and the Pacific Reporter issues following the grant of a rehearing upon the petition of the defendant. The practice of the Court has changed in the past 20 years. The former practice, when a petition for rehearing was filed and a rehearing granted, was to adhere to the original opinion for the court, or to issue a second opinion meeting the challenge of the petition—much as the Court addresses the issues raised when the challenge is to the decision of the district court. A good example is *Felton v. Finley*, 69 Idaho 381, 209 P.2d 899 (1949). The attorney, judge, or scholar who is interested in ascertaining the evolvement of the rule of law in that case gets the benefit of examining the first opinion for the Court, and, in turn, the eventual opinion for the Court. In my view this is as it should be, and I am unable to comprehend any good reason for withdrawing an opinion once it has been issued. Though it may be modified, superseded, or the result may change, it should at least be there. If this Court has arrived at an erroneous conslusion of law or has made a misstatement of fact, far better to concede the fact than to bury it.

Here the Petition for Rehearing contended (1) that the Court erred in denying the defendant's motion to suppress his April 8th statement, and the fruits thereof, and (2) that the Court's *Iwakiri* rule on use of hypnosis should be revoked, or at least modified to address the constitutional confrontation aspect of that rule. Where the rehearing was granted, and the Court received the benefit of additional briefing and oral argument, the science of jurisprudence is poorly served by a Court which declines to state the narrow issues raised on the Petition, and by not specifically addressing those issues.

Seeing the revamped edition of the earlier June 21, 1984 opinion for the Court, 84 ISCR 989, as inadequately refuting the defendant's Petition, and as not adding anything of substance, I stand on my opinion of June 21, 1984.

I agree that the conviction must be reversed. Although the majority avoids declaring that the trial court erred in admitting the testimony of the two hypnotized witnesses, error in that regard was clearly committed. As I mentioned in *State v. Iwakiri*, 106 Idaho 618, 682 P.2d 571 (1984), the State in this case, as it did in that, urged *against* adopting a rule which would allow the testimony of hypnotized witnesses, and contended in both cases that error in having allowed such testimony was harmless, i.e., that the prosecution's case in both instances was so overwhelming that the testimony had not been needed. Again I mention, as I did in *Iwakiri*, that this Court should lend more deference to the views of the solicitor-general—which parallel those of all the western states other than a 3–2 decision from the Wyoming Supreme Court.

Just this very month the Washington Supreme Court dealt with that exact subject. A fresh decision from a respectable court of a neighboring state may, perhaps, dissuade today's majority from so precipitately embracing the notion of tampering with the minds of witnesses before they testify, and thus impairing, if not totally destroying, the constitutional right of confrontation:

"Appellant challenges the admission of testimony of witnesses who had been previously hypnotized. In *State v. Martin*, 101 Wash.2d 713, 684 P.2d 651 (1984), we squarely addressed the question of admissibility of such testimony. In *Martin*, we adopted the *Frye* standard as a means of determining the admissibility of hypnotically aided testimony. *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). Applying the *Frye* standard, we examined whether the use of hypnosis in this context is generally accepted in the relevant scientific communi-

ty. We concluded that it is not. As one expert in the field has explained:

'The hypnotic suggestion to relive a past event, particularly when accompanied by questions about specific details, puts pressure on the subject to provide information for which few, if any, actual memories are available. This situation may jog the subject's memory and produce some increased recall, but it will also cause him to fill in details that are plausible but consist of memories or fantasies from other times. It is extremely difficult to know which aspects of hypnotically aided recall are historically accurate and which aspects have been confabulated.' "

Orne, *The Use and Misuse of Hypnosis in Court*, 27 Int'l J. of Clinical & Experimental Hypnosis 311, 317–18 (1979). *See also* Beaver, *Memory Restored or Confabulated by Hypnosis—Is it Competent?*, 6 U. Puget Sound L.Rev. 155 (1983); Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 Cal.L.Rev. 313 (1980).

"The unreliability of hypnosis as a means of restoring memory makes the use of hypnotically aided testimony unacceptable in the context of a criminal trial. Consequently, in *Martin* we held that 'a person, once hypnotized, should be barred from testifying concerning information recalled while under hypnosis.' *Martin*, 101 Wash.2d at [714, 684 P.2d 652]. As an exception to this general prohibition, however, we further held that witnesses may testify as to facts recalled prior to hypnosis if certain procedural safeguards are met. These procedural safeguards work to insure that the testimony of a previously hypnotized witness consists only of prehypnotic memories and is untainted by the hypnotic process. For example, *Martin* states that '[a] detailed record of the witness' prehypnotic memory should be preserved, as the party offering the testimony will have the burden of establishing what the witness remembered prior to

the hypnosis.' *Martin*, 101 Wash.2d at [724, 684 P.2d 657]. Recordation of the witness' prehypnotic memory permits subsequent independent verification as to the source of that memory. *See State v. Martin, supra* (Stafford, J., concurring in the result).

"Upon remand, the admissibility of the testimony of the previously hypnotized witnesses should be determined in accordance with our holding in *State v. Martin, supra.* Thus, testimony as to facts recalled during hypnosis would be inadmissible. Obviously, the authorities responsible for hypnotizing these witnesses were unaware of *Martin*'s procedural safeguards applicable to prehypnotic memory, therefore precise compliance with these requirements was impossible. On remand, in evaluating the admissibility of prehypnotic memories, the trial judge should determine whether there has been substantial compliance with these safeguards. The testimony of the previously hypnotized witnesses would be admissible if the State can show that the testimony consists solely of prehypnotic memory, thus assuring that the purposes of *Martin*'s procedural safeguards are satisfied."

*State v. Coe*, 101 Wash.2d 772 pp. 786, 684 P.2d 668 (1984).

I also agree with the majority opinion, insofar as it does go, in holding that the trial court erred in admitting evidence which the prosecution offered to prove a supposed sexual motive for the murder. This concept was indeed far-fetched and other than for the problem the majority would encounter if it did address the hypnosis assignment of error, the conviction and the ensuing sentence would likely this day stand. In the *Coe* case, *supra,* the prosecutor with the trial court's indulgence also embarked upon the same theme, which was unanimously held to be error. The Washington Supreme Court pin-pointed the rule more precisely and I believe more correctly than does our majority opinion today. I read the latter as suggesting the majority's view that prior activities are admissible to prove motive for a later crime—a very difficult

concept to accept as being applicable in this case. Here, it is, in the eyes of the majority, proper for the prosecutor to show alleged former statements and conduct to prove that there was some undefined sexual motive to rob and murder the woman attendant at a gas station. In such a manner the majority, while decrying only the extent to which the prosecutor was allowed to go, seemingly are placing this Court's stamp of approval on the interjection of sexual crimes and/or immorality into prosecutions based on information charging felony murder committed in perpetration of robbery. The recently expressed views of the Washington Court are realistically in harmony with sound propositions of law:

"As noted above, Coe's sexual acts with his girl friend were admitted to establish modus operandi. Where prior acts are sought to be admitted to show modus operandi, 'the primary purpose ... is to corroborate the *identity* of the accused as the person who likely committed the offense charged.' *State v. Irving*, 24 Wash.App. 370, 374, 601 P.2d 954 (1979), *review denied* 93 Wash.2d 1007 (1980). The method employed in committing the act must be so unique that mere proof that an accused acted in a certain way at a certain time creates a high probability that he also committed the act charged. *United States v. Silva*, 580 F.2d 144, 148 (5th Cir.1978); *State v. Fernandez*, 28 Wash.App. 944, 949–50, 628 P.2d 818, 640 P.2d 731 (1980); *State v. Irving, supra.* 'The device used must be so unusual and distinctive as to be like a signature.' E. Cleary, *McCormick on Evidence* § 190, at 449 (2d ed.1972).

'A prior or subsequent crime or other incident is not admissible for this purpose merely because it is similar, but only if it bears such a high degree of similarity as to mark it as the handiwork of the accused.'

*United States v. Goodwin*, 492 F.2d 1141, 1154 (5th Cir.1974).

"The requirement that the evidence be distinctive or unusual insures that the evidence is relevant. The greater the

distinctiveness of the act, the higher the probability that the defendant committed the crime. The admissibility of this highly prejudicial evidence is thus limited to those cases in which the evidence is highly relevant.

"The words and actions of the perpetrator of the rape, though similar to Coe's behavior with his former girl friend, do not meet the stringent test of uniqueness required for admission to establish identity. While we make no determination as to what constitutes customary behavior in sexual relations today, we do not believe Coe's behavior in his sexual relationship with his former girl friend was sufficiently 'unusual and distinctive' to warrant admission under ER 404(b). Further, we question the relevancy of an individual's behavior in a consensual sexual relationship to demonstrate modus operandi with respect to a violent nonconsensual sexual act. The trial court abused its discretion in permitting the presentation of this evidence." *Coe, supra,* at 778, 684 P.2d 668.

The Court today would better lay the groundwork for an errorless second trial by a holding that, pursuant to defense counsel's *in limine* motion, all evidence offered in support of the prosecutor's sexual fantasy theory should be excluded. Such evidence is simply not *highly relevant.* This Court in earlier days, differently constituted, has always displayed an awareness of the insurmountable prejudice which permeates a sex crime. The crime charged here, however, was murder in connection with a planned armed robbery— thus compounding the prejudice and magnifying the error. As the Washington Court stated the same proposition, "Careful consideration and weighing of both relevance and prejudice is particularly important in sex cases, where the potential for prejudice is at its highest." *Coe, supra,* at 781, 684 P.2d 668. *See also* Slough & Knightly, *Other Vices, Other Crimes,* 41 Iowa L.Rev. 325, 333–34.

I am not able to agree with the majority's bald conclusion that the trial court did not err in failing to suppress the first statement made to the police on April 8 and the items seized pursuant to a search warrant based upon Bainbridge's answers in that police interrogation. This, says the majority, was a factual dispute, and then adds that the trial court ruling was supported by *"substantial* evidence"—said to be the testimony of the two detectives and a girl friend of defendant's.

Here we are ploughing old ground which I at least delved into in the companion *Sivak* case. In *State v. Sivak,* 105 Idaho 900, 915, 674 P.2d 396, 411 (1983), I noted that:

"Sivak, who testified at his trial, claimed that Bainbridge did all of the robbing and murdering while he, Sivak, was merely in the company of Bainbridge at a poor time. Bainbridge, who did not testify at his trial, gave taped statements to the investigating officers which, on his turn to talk, blamed the entire criminal activity on Sivak, Bainbridge by misadventure merely happening to be with him at the wrong time and place, as it turned out. There were no other witnesses to the crime of murder than these two defendants. The two different juries convicted both of first degree murder and robbery, Sivak testifying to his innocence, Bainbridge not taking the stand."

Writing only of the April 9 statement, I noted that "The transcript of the tape is 75 pages long. No purpose would be served by setting it out, other than to demonstrate the skills of the interrogators. It suffices to say that Bainbridge did, as might be expected, attempt to exonerate himself from both the robbery and the murder, and fix all blame on Sivak." (Footnote omitted.)[1] My understanding is that defense counsel for Bainbridge sought suppression of the statements taped on April 8—not just to keep them from the jury, but in

1. The "skills of the interrogators" were such that the trial court suppressed the tape of the April 9 interview of Bainbridge. Nevertheless, it surfaced as part of Sivak's pre-sentence report—unsworn statements absolutely not subject to cross-examination.

order to reach out in turn and suppress the evidence obtained from the search warrants, a Fruit of the Poisonous Tree principle. I do not see in the transcripts where the April 8 interrogation of Bainbridge was ever offered into evidence *against* him by the prosecution.

In footnote 1 to the majority opinion, it is said that the April 9 taped statement, notwithstanding its exclusion by order of the Court, was played to the jury by defense counsel. I do not so read the record, but rather find it clear that it was both sides of the April 8 tape which the defense offered as their exhibit, and which the State had had marked as State's Exhibit 117. Now, if indeed it was the April 9 statement which was played to the jury, I stand guilty of an abyssmal reading of pages 1982–2004 of the Reporter's Transcript. But it may be the majority who is at fault in that respect, and equally at fault in not observing that a main item of defense counsel's brief is a well documented portrayal establishing that the trial court did err in its ruling—none of which argument of counsel is discussed in the majority opinion. While short opinions, or even no opinions, may be coming into vogue, the better appellate practice should be as it has always been, and that is in an important case to meet a good argument headon and either accept it or distinguish it. Here we are presented with just such an argument:

"In the early evening of April 8, 1981, two days after the murder, two investigators arrived at the Appellant's residence in Garden City to question the Appellant about the offense. Earlier, the Co-Defendant, Lacy Sivak, had indicated to investigating officers that both Defendants were at the Phillips 66 station about the time the murder had occurred, but that neither of them were involved.

"During this initial contact, the two detectives from the Ada County Prosecuting Attorney's Office, Dee Pfiefer and Vaughn Killeen, requested that the Appellant sign a Rights Waiver form, but he refused. A subsequent discussion followed concerning the possibility of the Appellant accompanying the officers to the Garden City Police Station, and the Appellant reluctantly agreed to go. At the hearing on the Motion to Suppress, the facts were in dispute as to whether Appellant requested the assistance of counsel, but it is undisputed in the record that, rather than talk to the officers, the Appellant first refused to sign a Rights Waiver form and requested that his Parole Officer be contacted so that the Appellant could talk to him. . . .

"En route to the Garden City Police Station, it was decided that the Law Enforcement Building would be a more appropriate place to question the Appellant. When they arrived at the Law Enforcement Building, Appellant was immediately interrogated by Vaughn Killeen and Dee Pfiefer, even though Appellant had requested that his Parole Officer be present first, and, according to his testimony, that he be provided an attorney. Appellant was interrogated extensively by the two officers, but did not disclose anything until his Parole Officer, Greg Fisher, arrived. Appellant made a statement to Greg Fisher, then subsequently to the two detectives, and was formally arrested. A tape recording of the interrogation was made, and offered in evidence as Defendant's Exhibits I and J. A transcript of this interrogation appears in the record as Plaintiff's Exhibit No. 117.

"Based upon the information the Appellant gave during his April 8th statement, a probable cause arrest of Lacy Sivak was made that evening. In addition, search warrants were issued for Appellant's residence, at which various items of clothing were seized (and admitted at Trial), a search warrant was issued for the storage shed of Lacy Sivak, at which the murder weapon was located, and a warrant issued for Lacy Sivak's motor vehicle, from which various traces of blood were obtained.

"The following day, on April 9, 1981, Appellant was again interrogated by the arresting officers. During this interrogation the Appellant again made various statements. A transcript of this interrogation was stipulated into evidence for the

suppression hearing, and the tape recording was played at the Aggravation Hearing.

"Appellant filed a Motion to Suppress, and subsequently an Amended Motion to Suppress, seeking to suppress Appellant's statements made April 8th and 9th, as well as all items seized pursuant to the search warrants which were based upon Appellant's statements. (Clerk's Transcript pages 83 through 85) The Court denied Appellant's Motion to Suppress his April 8th statement, and all items seized pursuant to the search warrants based on this statement, but did grant the Motion to Suppress as to Appellant's April 9th statement. This was upon the basis that Appellant asserted his right to counsel but was interrogated anyway. (Clerk's Transcript page 189 et seq.)

"The Appellant submits that the facts in the record generally show that the Appellant initially did not want to talk to the officers, or go with them, requested the assistance of legal counsel, and also the counsel of his Parole Officer. (Transcript, Pre-Trial Hearing [hereafter "PTH"], pp. 30, 32, P. 75, lines 1–5) The facts indicate that he made the statements in question without the assistance of legal counsel, and that he was interrogated even before his Parole Officer was there to assist him.

"The evidence further indicates that rather than effectively discussing the matter with the police officers, by telling them the truth, the Appellant initially lied to them. (PTH, p. 41, lines 17–24) The officers thereafter resorted to deception by confronting him with non-existing evidence, implied through various statements that it would be better for him if he changed his story and told them the truth, attempted to play down the seriousness of the situation by stating to the Appellant that he was not being accused. They told Appellant that if he told them what happened things might not seem all that bad. They further made implied threats to the effect that they would 'assume the worst' if Appellant did not talk, and that the Court would take his attitude into consideration. Furthermore,

the evidence indicates that the Appellant was frightened, wanted to talk to someone other than the officers, but finally made a statement to Greg Fisher, his Parole Officer, when he arrived. Considering the evidence produced that showed Appellant to be of below normal intelligence, a follower, and 'hyper-suggestible to the influence of others', Appellant submits that there was neither a voluntary, nor a knowing and intelligent waiver of his rights.

"Going back to Appellant's first contact with the detectives, the record shows that Vaughn Killeen and Dee Pfiefer visited the Appellant's residence in the late afternoon of April 8. The Appellant's wife, Ruby Bainbridge, was there at the time. The Appellant stated something to the effect that 'I'll bet you want to talk about the murder', (PTH, p. 51, lines 10–12) and the officers stated that they were going from house to house in the area talking to people about the incident. Appellant was initially hesitant to talk to the officers, and when presented with a *Miranda* rights waiver form, he refused to sign it. (PTH, p. 52, lines 16–23; p. 31, lines 21–25; p. 32, lines 1–9) Also, some discussion took place about talking to the Appellant alone in various rooms of the house, but the Appellant finally stated that he wanted to consult his attorney, or at least his Parole Officer, before talking to them. The testimony on whether the Appellant requested legal counsel at that point was disputed, but for the reasons which will be discussed later herein, Appellant submits that this dispute of fact should have been resolved in Appellant's favor. In any event, the Appellant indicated an unwillingness to waive his right to remain silent, and talk to the officers at that time, by refusing to sign the waiver form and stating that he would not give them a statement until his Parole Officer was present. At this time, it appeared to both the Appellant and Ruby Bainbridge that he was 'not free to go', because the officers would never let him out of their sight, and because they would not agree to Mrs. Bainbridge's suggestion that, if they wanted to talk to Appellant, they should go get the Parole Officer and

bring him back. (PTH, pp. 32–33; p. 25, lines 22–25; p. 26) Despite the Appellant's hesitancy and unwillingness to talk to the officers at that time, he finally agreed, at their suggestion, to go with them.

"At the Law Enforcement Building, the Appellant was again presented with a rights waiver form, which was not explained to him, and was told to read it and sign it. The Appellant, according to his testimony, again requested counsel and his Parole Officer, but signed the waiver form, because he was led to believe the questioning 'wasn't really anything', and that his Parole Officer would be there at any moment. Despite the fact that Appellant's Parole Officer had not arrived, the police interrogation began. (PTH, pp. 33–34)

"The Appellant testified that he again requested an attorney to be present at the Law Enforcement Building, but that he was informed by the officers that there was no way they could arrange for an attorney to be present with him at that time. (PTH pp. 33–34) This was again disputed by the testimony of Dee Pfiefer, but in view of the totality of the circumstances surrounding Appellant's statements, Appellant submits that the Court should have resolved this dispute in Appellant's favor, and concluded that he did in fact request the assistance of legal counsel, both at his house, and at the Law Enforcement Building before giving his statements.

"One factor that Counsel wishes to bring to the Court's attention, is the practice which has always bothered Counsel, and that is the practice of not turning on the tape recorder while a Defendant is being advised of his rights, (and any conversation regarding 'why' he should waive those rights) and recording only that portion of his confession *after* he has been advised of and waived his rights. Interestingly, the tape recorder was turned on, on April 9, 1981, before the Appellant had been presented with the Rights Waiver form. On pages 1 and 2 of the transcript of the Appellant's April 9th statement, the Appellant is simply instructed to 'take this and

read your rights and go ahead and initial, just like you did yesterday.' The officers then go out of the room for a minute while the Appellant goes through the Rights Waiver form, and immediately upon their return, the Appellant states:

'Can I have an attorney present? Because I don't want to have none of this on my, it's already on my record I guess. (April 9 transcript, Page 2.)'

The Appellant submits that it would be unusual for the Appellant to wait until he is making a second statement to ask for an attorney for the first time, and that this corroborates the fact that he did request that he have assistance of counsel on April 8. Nevertheless, Mr. Pfiefer's response to the Appellant's request for legal counsel is most interesting. He states in pertinent part of page 2 of the transcript as follows:

'PFIEFER: Let me clarify why we are here. We are here to talk to you about the incident that we have already talked about; about Dixie Wilson, and if you have an attorney here, then we aren't going to be able to talk to you.

\*    \*    \*    \*    \*    \*

'You know the interesting thing about it, you know how you hear all these things about your rights, you know, you have the right to remain silent, but you do have the right also to talk to us if you want to. And you exercised that right.

'Randy indicated that he might want to have an attorney or asked if he could have one and I explained to him that he most assuredly could have an attorney but that if there is an attorney present here right now, we won't be able to talk to him...

'BAINBRIDGE: I don't understand that too well.

'COLLINS: Having these rights in mind, you either want to talk to me or you do not.

'BAINBRIDGE: I do want to talk to somebody.

'COLLINS: Okay, so why don't you circle do, okay, that's what you want to do, and then initial there.'

"Interestingly, the officers deny Appellant requested counsel on April 8, and for some reason the tape recording does not begin until Appellant signed the rights waiver form. It is apparent from the procedure on April 9, that the Appellant requested counsel, but that he was talked out of it by the police officers, by their indicating to him that if he requested counsel, he wouldn't be able to talk to them, leaving the Appellant to conclude whatever bad result may arise out of that. (He had been told things the day before that the Courts go on attitude, and if he didn't talk, the officers would 'assume the worst'.) Apparently, however, the consequences were minimized in the Appellant's view, since he was told that the statement could only 'potentially' be used against him, and the apparent statement to the effect, and tacit agreement by the officers, that what he had stated, and would state, was not really incriminating evidence against him.

"Also significant in this respect is officer Pfiefer's testimony at the Motion to Suppress Hearing regarding his procedure when he advises someone of their constitutional rights, and they request the assistance of counsel. His testimony was to the effect that he had *never* obtained counsel for individuals, but that he simply terminated the interrogation. (PTH, p. 63, lines 16–23) It is certainly apparent that in both instances legal counsel was not procured for the Appellant. It is also apparent that on April 9, when counsel was requested, the interrogation was not terminated, in accordance with Mr. Pfiefer's alleged procedure. Counsel would submit that the Appellant's hesitency to talk to the officers, his refusal to sign a waiver form at his house, the fact that he requested counsel on the second date but was talked out of it, his request that he at least have his Parole Officer before he was questioned, being questioned before his Parole Officer arrived, the fact that the advice of rights and whatever statements were made to induce the Appellant to make his first statement were not tape recorded, are all circumstances which suggest that the factual dispute regarding Appellant's request for counsel on April 8, should be resolved in his favor.

"At this point, it is significant to consider the mental capacity of the Appellant. Previous psychological evaluations by Dr. Jean S. Gardner, Chief Psychologist of the Umatilla-Morrow County Mental Health Clinic in Pendleton, Oregon, and Michael Murphy, a Social Counselor with the Vocational Rehabilitation Department in Pendleton, Oregon were provided the lower Court in support of the Motion to Suppress. (PTH, p. 109 lines 13–21) The testimony was put into the record through video depositions. This evidence demonstrated that the Appellant's behavior and thinking were suggestive of organic brain dysfunction, minimally present from childhood, and possibly exacerbated by the severe head injury Appellant sustained in a motorcycle accident. The Appellant was seen as a good-natured, eager to please individual, and 'hyper-suggestible to the influence of others.' The Appellant also had a definite reading and writing problem, and, although not retarded, was in the dull-normal range of intelligence. The Appellant testified that he only had a 10th grade education, and flunked English. The Appellant also suffers from memory lapses, was described as 'scatter brained', often incapable of remembering from one moment to the next instructions that were given to him.

"Dr. Gardner's testimony begins on p. 1902 of the Transcript. Regarding the Appellant's reading and writing skills, Dr. Gardner testified (TR P. 1906, lines 19–21) that she ... 'had to make it a point to read stuff outloud, like his consent for treatment or consent for evaluation, to be sure he understood it.' At p. 1949, Mike Murphy testified that Appellant ... 'would try and make up for the fact that he could not read and write by possibly talking a little bit more than he should at times in order to avoid an embarrassing situation where he had to read or write.'

"This coincides with what happened on April 8. When Appellant was to sign the rights form, according to officer Pfiefer, the Appellant would continue to talk, and

finally 'took the form and started initialling it.' (PTH, p. 66, lines 1–10.)

"The aspects of the Appellant's mental capacity are especially significant when considering whether the Appellant's waiver of his rights on April 8 was knowing and intelligent. The transcript of his statements indicates that, when initially asked if he understood his rights, he would reply yes, but later on would indicate that he 'doesn't understand that'. Also his hyper-suggestibility to the influence of others, his eagerness to please others, together with his reading and writing problems, would be especially significant when considering the tactics the officers used on him prior to the time his Parole Officer arrived.

"Significantly, after the Appellant signed the rights waiver form on April 8th, and the tape recorder was turned on, the transcript of his statement at page 1 starts right out with a misleading explanation by the officers as to why Appellant is being questioned. The explanation implies that the Appellant is not a suspect, that they just want to know whether the Appellant knew anything about the incident, and to assist them in identifying some other suspect. Dee Pfiefer states at page 1:

'PFIEFER: Okay. You've agreed to talk to us, we have some questions for you about this situation in Garden City and we're kind of interested in finding out, you know, what, if anything, you know about it. Its going to help us, you know, help us to put together a suspect. You know, somebody who might, who might be involved in this. So you understand why you're here and everything?''

'BAINBRIDGE: Yea, I do.'

"The transcript of the Appellant's statement given on April 8th clearly shows that he did not want to talk to the officers before his Parole Officer got there. However, after he completed his initial story (which he later admitted was a lie because he didn't want to talk to them), the officers, still, with out Appellant's Parole Officer being there, confronted him with the fact that they simply did not believe him. The

scenario leading up to Appellant's statement to Greg Fisher begins at page 26 of the April 8th statement.

"At page 26 the officers tell the Appellant that he is not telling the truth, 'but I think that you want to help us.' At page 27 Officer Pfiefer indicates that 'I think you're a good person, I do.' On page 28 Officer Killeen indicates that there are a lot of reasons that they are not going to go into, but that they are not 'shooting in the dark', and 'we want to hear it from you right now.' On the same page Officer Killeen states 'why don't you tell us what happened?', but there is no response from the Appellant. Officer Pfiefer makes a statement 'You feel pretty bad about it.' And the Appellant again makes no response.

"Receiving no response, the officers then turn to deception. At page 29 the statement is made that they have talked to Lacey Sivak, that they had a nice long chat with him and know the whole story, and that the Appellant 'has been had', indicating that Lacey Sivak had confessed to the crime, placed the whole blame on the Appellant, all at a time when he had not. Also on page 29 Officer Killeen indicates that they have all kinds of witnesses that placed the Appellant at the scene of the crime, and told the officers what was going on at the time. Again, at that time, the officers had no witnesses who had identified the Appellant. (Tr. p. 1994, lines 23–25; p. 1995, 1.1) At page 30 the Appellant again indicates that he doesn't know what happened, and the Appellant again denies that he knew anything about it on page 31. Further, on page 31, Officer Killeen seems to imply that they are interrogating the Appellant for purposes other than eliciting incriminating statements from him. Officer Killeen states in pertinent part as follows:

'Well, we understand that but what we're trying to say is that we just want to know why. You know, its just as simple as that. You know, the thing is like I said, you know, we'd just be playing games here if, you know, we beat

around the bush, we know what happened as I said and I can only repeat myself. You know what happened. We just want to know why. Why? Just explain it to us.

Why, Why did it happen.'

At page 32 the Appellant again denies he knew what happened. At page 32 the officer then creates the impression that if he does not make a statement things might be bad for the Appellant. He states as follows:

'You want us to just assume the worst? We know you were involved in this. Do you want us to assume that...'

Officer Killeen also creates the same impression on page 32 by his statement:

'You were there. You were in there. Okay, you and Lacey ... I mean, you know how, how old do we have to be ... you and Lacey, the gal's dead. Okay, it's all there. Okay, we've talked to Lacey. Like we've said, we've talked to Lacey. Lacey had told us his story as to what happened. Okay? We've got him on the thing. You know, we figured that we would give you a fair opportunity, you know, on the whole thing to hear your story because we've already got it.'

Thus, at this point, the officers are not only deceiving the Appellant by confronting him with non-existing evidence, but they are also creating the impression that the 'worst' will occur if he doesn't make a statement. Regardless of this, the Appellant again denies any knowledge of the incident at the top of page 33.

"Subsequently, the purpose of the interrogation, or the consequences, are again misrepresented to the Appellant by the following statements at page 33:

'BAINBRIDGE: You guys are accusing me.

'KILLEEN: Okay, no, I'm not accusing you ah...

'BAINBRIDGE: I haven't even got my Parole Officer here yet, or is he here?

'KILLEEN: Yeah.

'PFIEFER: Greg, Greg come inside.'

Then, with the Appellant's Parole Officer present, Killeen again summarizes that they have already talked to Lacey, that they have numerous witnesses that have put the Appellant and Lacey at the scene of the crime, and that Lacey had already made statements and confessed to them on the whole thing. At page 34, Killeen tells the Appellant that 'The Court systems look at attitude in every situation', further enforcing the previous implications that something bad would happen if the Appellant did not cooperate. Then Pfiefer states that 'Maybe you want to hear it from Greg whether or not ah, whether or not you ought to cooperate with us and be honest with us.' And, in response to that, the Appellant replies, 'No, I'm myself, you see, I'm frightened.' In response to the Appellant's statement that he was frightened, and after admonitions that the officers should not be allowed to 'assume the worst', that they weren't accusing him, and that the Court systems look at a person's attitude, Pfiefer again attempted to minimize the seriousness of the situation by stating at the bottom of page 34 and top of page 35:

'A lot of things happen when you look at them they look pretty bad, but when you find out the reasons why they happen, they're not all that bad or at least, least the reasons are a little different. Ah, we're not lying to you when we know that you are involved in this. We're not lying to you. You know that you wouldn't be here, you know, ah, if we didn't know. And, ah ... we are interested naturally in whether or not you have an account of why it happened, or how it could have happened. Don't leave us just to draw the worst conclusion because of what we saw.'

The above also reasserts the untrue statement about the evidence the officers had and also the implicit threat, 'don't let us assume the worst.' Then the Appellant states to his Parole Officer 'Yes, about this involvement, cause I'm frightened and you're the only one that can help me ... can do, I'm just frightened.' It's at this point that the Parole Officer joins in the

encouragement to get the Appellant to make a statement. Greg Fisher states to the Appellant that he knows both Officers Killeen and Pfiefer, that he has worked with them before, 'and they're, they're both super good guys, they're super honest guys, and they called me immediately because they wanted me involved. Ah, can't say enough about that...' At page 36, Killeen asks the Appellant if he wants to talk to Greg alone, and the Appellant again states 'Well, I'd like to, I could—really like, I would, I mean let's say I'm frightened.' At this point, the Appellant then gives the statement to his Parole Officer. During that statement, at page 50 of the transcript, the Appellant again states, 'honestly, I am truthfully saying I was scared to death until I got to speak with you.'

"In summary, Appellant submits that the evidence essentially indicates the following: The Appellant is of dull-normal intelligence with reading and writing problems, and is hyper-suggestible to the influence of others. He initially asked to have an attorney present, but one was not provided. He was hesitant to go with the officers, refused to sign a rights waiver form, and, based upon the conduct of the officers keeping him in sight, and refusing to leave and bring the Parole Officer back, he was being detained at the time. The Appellant did not want to talk to the officers, was hesitant to go, but went with them anyway. At the police station, he again asked for his attorney, and was told that there was no way one could be provided. He signed the Rights Waiver form (which according to Dr. Gardner he would not understand) because he was told his Parole Officer was on the way, and that 'there wasn't anything to it.' The form was not read or explained to him. Then, although the Appellant had requested that his Parole Officer be present, he was interrogated anyway.

"After he gave a deceptive story because he didn't want to talk to the officers, he was confronted with their opinion that he was not telling the truth. He was asked if he didn't want to 'help' the officers, and told that he was a good person. He still wouldn't talk, and deception was used, to lead the Appellant to believe there were a lot of eye witnesses placing he and the Co-Defendant in the store at the time of the incident, that the officers knew what happened, that the Co-Defendant had confessed and implicated the Appellant and that he had in fact 'been had'. The officers then stated that they 'just wanted to know why', asked the Appellant if he wanted them to 'assume the worst', and further indicated that they were not accusing the Appellant. The Appellant's Parole Officer then shows up and it is pointed out to the Appellant that his attitude would be important in the Court system, that his version of the facts might not be 'all that bad', and that the officers were not lying to him and were both 'super honest' guys. The Appellant again indicates that he is frightened, but finally agrees to talk to the Parole Officer. The Appellant submits that this is hardly a voluntary, or knowing and intelligent waiver of his constitutional rights.

"The Idaho Supreme Court has recently recognized several factors significant in this case, that is, the powerful psychological influences that come into play while a person is being detained and interrogated, the importance of the right of accused to legal counsel, and the strong presumption against any alleged waiver of that right. See *State of Idaho v. LePage*, 81 ISCR 553, at page 556, where the Court stated in pertinent part as follows:

'As the Supreme Court noted in *United States v. Henry* [447 U.S. 264], 100 S.Ct. 2183 [65 L.Ed.2d 115] (1980), there are "powerful psychological inducements to reach for aid when a person is in confinement," and "the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover government agents." '

"In *Bement v. State*, 91 Idaho at 388, 395, 422 P.2d 55, 62 (1966), the Court stated that:

'The right to counsel "the most pervasive right of an accused," has been ac-

corded singular significance by federal courts. So important is the right, and *so strong the presumption against its waiver*, that a trial judge's clear and recorded statement of the right to an accused felon before inquiring whether the accused wishes to "waive" the right, followed by the accused's immediate affirmative "waiver," will not necessarily compel the finding of intelligent waiver.'

Although a problem with mental capacity in and of itself may not per se make a waiver invalid, the *diminished capacity* of a defendant is nevertheless *a factor* in considering the voluntariness of his waiver. *In Interest of Williss [Willis]* [89 Ill. App.3d 347, 44 Ill.Dec. 760], 411 N.E.2d 1126 (Ill.App.1980); *State v. Doby* [273 S.C. 704], 258 S.E.2d 896 (S.Carolina 1979); *State v. Wright* [274 N.C. 84], 161 N.[S]E.2d 581 (N.Carolina 1968). Appellant submits that, when considering his diminished mental capacity together with the Appellant's hesitancy to talk to the officers, their attempts to diminish the seriousness of the situation, the use of deception, and innuendos regarding benefits of cooperating (the courts look at attitude), as opposed to not cooperating (they would assume the worst), the Appellant's waiver certainly was not voluntary.

"Another factor is the implied promises of lienency by the officers. Although promises of lienency or other benefits from cooperation do not, in and of themselves, render a confession inadmissible, this, again, is a factor to consider in the totality of circumstances as to whether a Defendant's admission is voluntary. *State v. Alger*, 100 Idaho 675, 603 P.2d 1009 (Idaho 1979).

"Another tactic by the officers is the statement on April 9th that the Appellant had a 'right to talk', as well as a right to remain silent. Although this is not in and of itself sufficient to invalidate voluntariness, it nevertheless is a form of interrogation which has been disapproved by the courts. An analogous situation arose in *McClellan v. State*, [53 Wis.2d 724], 193 N.W.2d 711 (Wisconsin 1972). In that case,

the Defendant was advised that his statement could be used 'for or against' him. While not invalidating the Defendant's confession for this type of warning, the court nevertheless indicated its disapproval of this practice, and further stated that it could, under certain circumstances, render an admission inadmissible. The Court stated at [193 N.W.2d] page 715:

'While we cautioned against giving the type of warning minimally approved in *Quinn* [*v. State*, 50 Wis.2d 101, 183 N.W.2d 64 (1971)], we did not find it, in those circumstances, to be constitutionally defective. It is, however, a practice that should not be encouraged, and in some circumstances could result in the vitiation of an otherwise antiseptic confession.'

"The case law cited above establishes a number of interrogating tactics that do not, in and of themselves, invalidate a confession. These tactics nevertheless are not encouraged by the Courts, and are considered to be factors in determining voluntariness. These are the use of trickery or deception to obtain an admission, promises or inducements of benefits by cooperating, implied threats of bad consequences for not cooperating, and minimizing the consequences of making an admission by indicating to the Defendant that his statement may be used 'for him' as well as 'against him'. In this instance, all of these questionable practices were employed.

"A very analogous case is *Commonwealth v. Meehan* [377 Mass. 552], 387 N.E.2d 527 (Mass.1979). Counsel feels this case is especially analogous because it involves a situation where a number of tactics employed by the police, in and of themselves, were not sufficient to vitiate the voluntariness of the confession, but, when all of the practices were taken together, the Court held that the Defendant's waiver of his rights was involuntary.

"In *Meehan, supra*, the Defendant was young, 18 years of age, had a poor educational background, and his judgment was impaired through intoxication. He was not informed that he had a right to one phone

call to his family and friends, and confessed after being told that the case against him was established when it wasn't. This was after receiving assurances that the confession would assist in his defense.

"In the case at bar, the Appellant, though not young, had a mental capacity which was certainly diminished, he did not want to talk to the officers but was talked into it, the strength of the case against him was misrepresented, he was given the impression that it would be better for him if he made a statement, and that if he didn't, the officers would assume the worst.

"When *Meehan* was initially arrested, the Miranda warnings were recited to him and the defendant was asked to acknowledge each sentence as it was recited. The defendant did so by saying yes or no after each sentence. The Defendant initially made exculpatory statements, and the interrogating officer would switch from one subject to another. The Defendant eventually asked the interrogating officer if he made admissions, what bearing it would have on his case. The interrogating officer indicated a number of times that he could make no promises, and that he was only in a position to make it known to the Court and the attorneys that he had cooperated. However, the interrogating officer did indicate that this would be helpful to his defense. The interrogating officer then took a second line, which was to indicate that there were extenuating factors, which may diminish the consequences of his statement.

"The Court analyzed a number of factors in *Meehan,* which added up to its conclusion 'that the confession was involuntary. 'The factors were: communication of incorrect information about the strength of the Commonwealth's case; assurance that the defense would benefit from a confession; defendant's unstable condition combined with his youth and inexperience; failure to inform the defendant that he could telephone his family or friends.' *Supra* [387 N.E.2d] at page 533.

"With regard to overstating the Commonwealth's case, the Court stated at page 533 of the opinion:

'Taken alone, the misinformation, would not, we think, suffice to show involuntariness [citations], but the judge could view it as a relevant factor in considering whether the defendant's ability to make a free choice was undermined.'

At page 534 of the opinion the Court stated:

'The judge could find that the police overstepped the permissible line in advising the defendant about the consequences a confession might have for the conduct of the defense.'

"The Court also acknowledged authority to the effect that impaired capacity did not in itself vitiate the voluntariness. But the Court stated at page 535:

'The judge concluded that the defendant's judgment at the time was "dim" and "impaired". It should be assumed that this condition would not alone justify suppression of the admissions [citations], it would still be entitled to count in the judge's total assessment. * * * So also the judge could give weight to the defendant's youth, inexperience, and limited schooling.'

"The Court also noted that, although State law provided the defendant with a right to make one phone call to his family and friends, and that this statute was violated, it had not, on that basis alone, ordered a confession suppressed. The Court stated at page 535:

'We have not yet ordered suppression in the case where, although deprivation has occurred, it was not through proved intention; but we have lately again given warning of the importance of the statutory duty. [Citations] We agree with the judge that the failure affirmatively to comply with the statute is a factor in deciding whether a confession, vulnerable on other grounds, should be suppressed.'

"After pointing out the several improprieties mentioned above, and the fact that any one of them alone would not be sufficient

to require suppression of a confession, the Court nevertheless concluded, that taking all of these factors in total, the confession should be suppressed, and affirmed the decision in the lower Court. The Court stated at page 536 of the opinion:

'To conclude: The defendant, 18 years of age, with a poor educational background, uninformed of his right to reach his family or friends, his judgment impaired through intoxication, confessed after being told that the case against him was established and after receiving assurance that the confession would assist in his defense. We should not interfere with the judge's conclusion that the confession was involuntary and inadmissible.'

The Appellant submits that the 'totality of the circumstances' in this case requires that the Court find that the Appellant did not voluntarily waive his Fifth or Sixth Amendment rights. There were a number of practices employed by the interrogating officers, and other circumstances, which, in and of themselves, have been held in various cases not to destroy voluntariness. However, in this case, they all add up to the conclusion that Appellant's waiver or relinquishment of his right was not intelligent or voluntary.

"In addition to all of the psychological ploys described above to get the Appellant to make a statement, his requests for legal counsel were ignored, and he further indicated his intent to assert his *Miranda* Rights by requesting to talk to someone other than the police officers. Counsel submits that the fact alone that the Appellant initially refused to sign the rights waiver form or talk to the officers, and then requested that he talk to his Parole Officer, must legally be construed as an assertion of his *Miranda* Rights.

"An analogous situation arose in *People v. Parker* [45 Cal.App.3d 24], 119 Cal.Rptr. 49 (Cal.App.1975). In that case, a defendant was advised of his rights under *Miranda*, and in response thereto the Defendant stated that he wanted to talk to 'somebody'. The officer asked him who he meant by somebody, and the defendant replied that he wished to see a prison doctor or a psychiatrist. The defendant also had previously written on his *Miranda* Rights. form that 'You are in as much of the dark as I am, I'll just wait.' Arrangements were thereafter made for a psychologist to talk to the defendant, and thereafter, the defendant made a confession. The California court held that *Miranda* Rights are deemed asserted where a person's conduct reasonably appears inconsistent with the present willingness on the part of a suspect to discuss his case freely and completely with the police at the time, and suppressed the confession. The Court stated [119 Cal. Rptr.] at page 52 of the decision:

'Appellant's response to the original Miranda Warning by the Denver police *and* his subsequent request to see a doctor or phsychiatrist prior to responding to the reinstituted question by the Los Angeles officers are *both conduct inconsistent with the present willingness to discuss his case freely at the time of the questioning.*' (Emphasis added.)

Clearly, the Appellant's conduct in this case was inconsistent with a present willingness to discuss the matters freely at the time of questioning, and this factor, alone, should be deemed an assertion of Appellant's *Miranda* rights.

"The fact that Appellant asserted his *Miranda* rights on April 8 would mean that any subsequent statements, to be admissible, would have to be pursuant to Appellant's 'intentional relinquishment of his rights', rather than pursuant to a voluntary waiver. *Edwards v. Arizona* [451 U.S. 477], 101 S.Ct. 1880 [68 L.Ed.2d 378] (May 18, 1981). The United States Supreme Court, in *Edwards*, distinguished between a voluntary waiver of Fifth and Sixth Amendment privileges, after being advised of that right, and a situation which arises subsequent to asserting one's Fifth or Sixth Amendment rights, in which case there must be an 'intentional relinquishment or abandonment of a known right or privilege.' (*Edwards* [101 S.Ct.] at page

1884). The Court noted at page 1884, the difference in these standards:

'Here, however sound the conclusion of the State courts as to the voluntariness of Edwards' admission may be, neither the trial court nor the Arizona Supreme Court undertook to focus on whether Edwards understood his right to counsel and intelligently and knowingly relinquished it. It is thus apparent that the decision below misunderstood the requirement for finding a valid waiver of the right to counsel once invoked.'

The Court further stated at pages 1884 and 1885 of the decision:

'. . . The Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a *valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.* We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police.' (Emphasis added.)

In this case, it is undisputed that Appellant invoked his right to counsel at least on April 9. The interrogation did not terminate, however, and the questioning continued. Since the officers did not tape record the portion of the interrogation on April 8 where Defendant was advised of his rights, as was done on April 9, Appellant asserts that the State did not meet its burden of showing Appellant waived his right to counsel—especially when considering all the other devious practices employed. The Court should conclude that the Appellant, at least by his *conduct* (refusing to sign the form and asking for his Parole Officer) on April 8, asserted his rights. Therefore, under *Edwards, supra,* since he did not

initiate further discussions, his April 8 statement should have been suppressed.

"*Edwards,* notwithstanding, once evidence is introduced questioning a defendant's waiver of his privilege against self-incrimination and right to counsel, the State has a *heavy burden* to show that those waivers were voluntary, knowing and intelligent and that the Defendant's rights were 'scrupulously honored'. *State v. Monroe,* 101 Idaho 251, 611 P.2d 1036 (1980). The record in this case certainly does not demonstrate that, despite the existence of the waiver forms signed by the Appellant.

"It is obvious that the Appellant did not initially want to talk to the officers, and it should therefore be incumbent upon the State to show that thereafter, the Appellant's decision to change his mind and make a statement to the officers was not the product of police involvement. The transcript of the Appellant's statement alone, emphatically demonstrates that this was not the case. The Appellant initially refused to sign a rights waiver form, and at least wanted his Parole Officer present before questioning. The investigators ignored that request. This conduct by the Appellant legally constituted an assertion of his *Miranda* rights.

"Appellant submits that the State could have met its burden by showing a number of things: by obtaining an attorney when he first refused to sign the form at his house; by recording that portion of the interrogation prior to the Appellant signing the waiver form, thereby dispelling the factual dispute as to whether the Appellant actually requested counsel on April 8th, as he did on April 9th. Also, the officers could have waited for the Parole Officer to arrive before the questioning started, as the Appellant requested. If the State on the 9th of April, had either obtained an attorney for the Appellant when he requested one, or terminated questioning, as Pfiefer testified was his customary procedure, this might serve as some corroboration for their position. Or, the officers could have demonstrated their efforts to

'scrupulously honor' the Appellant's privilege against self-incrimination and right to counsel, by refraining from the continued use of many discouraged practices, such as deception, inducements, implied threats, minimizing the consequences of Appellant's statements, or advising the Appellant that he had the right to talk to them as well as remain silent. But there is no evidence of any of these.

"The Appellant therefore submits that he attempted to assert his rights on April 8 but they were not scrupulously honored, and that the combination of practices employed by the officers, especially in view of the Appellant's mental capacity, rendered any waiver of his constitutional rights involuntary. For these reasons, the statement given on April 8th should have been suppressed. The Court properly suppressed the April 9th statement.

"Based upon the Appellant's statement of April 8th, in which he told the officers where the various items of evidence seized were located, the officers obtained the Search Warrants in question. Because the items seized were obtained pursuant to information provided by Appellant's April 8th statement, these items should have been suppressed under the 'Fruits of the Poisonous Tree Doctrine'.

"In *Commonwealth vs. Benoit* [382 Mass. 210], 415 N.E.2d 818 (Mass.1981), certain statements were obtained in violation of the Defendant's right to counsel under the Sixth Amendment. At the Defendant's request, the police officers retrieved the Defendant's suitcase, and, after some interrogation, eventually obtained his consent to search the suitcase, and items found therein were admitted in evidence against him. The Massachusetts Supreme Court held that these items should have been suppressed, stating at [415 N.E.2d] page 820 of the opinion:

'Implicit in the judge's ruling on the motion to suppress the contents of the suitcase is the premise that statements obtained in violation of a Defendant's right to counsel under the Sixth Amendment to the United States Constitution may not be used for the purpose of establishing probable cause sufficient to validate a subsequent search. We agree with this premise. In *Commonwealth vs. White*, 374 Mass. 132, 1388 [138]–139, 371 N.E.2d 777 (1977), affirmed by an equally divided Court, 439 U.S. 280, 99 Sup.Ct. 712, 58 L.Ed.2d 519 (1978), we held that *statements obtained in violation of a Defendant's Fifth Amendment right against self-incrimination cannot be used to establish probable cause sufficient to obtain a valid search warrant.* We observed in *White* that the policies underlying the "Fruit of the Poisonous Tree" doctrine in the search and seizure area may be even more compelling in the Fifth Amendment context. Id. at 139, 270 [371] N.E.2d 777. The reasons underlying our holding in *White* are equally applicable in the context of a Sixth Amendment violation.' (Emphasis added)

In *Commonwealth vs. Meehan* [377 Mass. 552], 387 N.E.2d 527 (Mass.1979) the Supreme Court of Massachusetts also stated:

'... The Commonwealth proceeds here on the assumption that the warrant rests on the confession. So the question is raised whether the warrant can legalize the seizure of the dungarees, when it is held that the confession must be suppressed. We agree that the answer is no, and this is explained simply on the ground that the confession was involuntary and thus directly offensive to the Fifth Amendment. [Citations] The conclusion follows from our recent decision of *Commonwealth vs. White, supra,* [377] Mass. at [568], 371 N.E.2d 777, where we suggested that the *reasons for excluding the product of a warrant based on an inadmissible confession are surely no less persuasive than those for excluding materials seized in persuance of a warrant supported by an affidavit infected by evidence that has been unlawfully seized.'* (Emphasis added)

"The Colorado judicial system has held that the Fruits of the Poisonous Tree Doc-

trine can be used to exclude evidence which was obtained by virtue of a Fifth Amendment violation. In *People v. Saiz* [42 Colo. App. 469], 600 P.2d 97 (Colo.1979), the Colorado Court of Appeals stated at [600 P.2d] page 101:

'We also agree with Defendant's contention that the victim's wallet should have been suppressed. In *People v. Maes,* Colorado [194 Colo. 235], 571 P.2d 305 (1977), it was held that:

"The clear purpose of enacting Section 19–2–102(3)(c)(I) of the Children's Code is to afford a special protection to a juvenile who is in police custody because of alleged criminal acts. This special protection provides an additional and necessary assurance that the juvenile's Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel will be fully afforded to him."

'Physical evidence which is the fruit of a statement improperly obtained from an adult is inadmissible, e.g., *People vs. Vigil,* 175 Colo. 373, 489 P.2d 588 (1971), and we can discern no reason why the rights of a juvenile in this regard should be any less than those of an adult. [Citations] We hold, therefore, that the wallet should have been suppressed because there was nothing to purge it of the taint of the statements solicited from Defendant in violation of Section 19–2–102(3)(c)(I).'

The Supreme Court of Colorado, in *People vs. Founds,* 621 P.2d 325 (Colo.1981) held that statements resulting from a previous violation of a persons Fifth Amendment rights must be suppressed. The Court stated at page 327:

'Accordingly, we conclude that the statements made by the Defendant before he arrived at the police station were properly suppressed.

\*　　\*　　\*　　\*　　\*　　\*

'We next consider the statements made at the police station.

'Any statements which were obtained as a product of a prior illegally obtained statement are "fruit of the poisonous tree" and cannot be received in evidence.'

Also see *State v. Papp* [64 Ohio App.2d 203], 412 N.E.2d 401 (Ohio Ct. App.1978) [412 N.E.2d], at page 406:

'We have no quarrel with, and no citation of authority is required to support, the Defendant's contention that evidence obtained in violation of one's Fifth, Sixth, and Fourteenth Amendment rights must be excluded from evidence. It likewise follows that all evidence obtained as a result of such illegal activity—the "fruit of the poisonous tree"—must likewise be excluded.'

In *People v. Curatolo* [76 A.D.2d 524] 431 N.Y.Supp.2d 713 (1980) the Court held, that since the Defendant's Sixth Amendment rights to counsel were violated, license plates, which were seized because of statements made in violation of the Defendant's Sixth Amendment rights, should also be suppressed. The Court stated at [431 N.Y.S.] page 718:

'Therefore, the police were obliged to respect the Defendant's expressed desire to consult counsel and were precluded from questioning Defendant in absence of counsel upon his arrest.

'The recovery of the license plates was obviously the direct result of the confession and, therefore, the license plates must be suppressed as tainted fruit. \* \* Accordingly, the statements made by the Defendant and the license plates should have been suppressed.'

Also see *United States v. Brookins,* 614 F.2d 1037 (5th Cir.1980), where the 5th Circuit Court of Appeals acknowledged that the Fruit of the Poisonous Tree Doctrine is not limited to Fourth Amendment violations, by its statement at page 1041: 'The exclusionary rule bars evidentiary "fruit" obtained "as a direct result" of an illegal search *or an illegal coercive interrogation.'* (Emphasis added.)

"In *Ex Parte Yarber,* 375 So.2d [1231] (Ala.1978 [1979] ), the Petitioner was prosecuted for first degree murder. The police failed to advise the Defendant of his rights under *Miranda,* and in response to certain

questions, the Petitioner gave them information which lead to the discovery of a projectile from a weapon found in his apartment. The court, citing the Fruits of the Poisonous Tree Doctrine, agreed with the Petitioner that the projectile should not have been introduced into evidence.

"A somewhat analogous case is *Commonwealth vs. Jones* [271 Pa.Super 528], 414 A.2d 379 (Penn.1979). This case was based upon a violation of a Pennsylvania statute requiring arraignment without unnecessary delay, which is essentially a provision designed to protect a person's Fifth and Sixth Amendment rights. During the unnecessary delay, the Defendant was interrogated, and provided the police with information leading to the discovery of the murder weapon. The Court held that in addition to Defendant's admissions, the weapon should also be suppressed, because the admissions were obtained illegally. The Court stated at [414 A.2d] page 383 of the opinion:

'Because the case must be remanded for a new trial, the trial court will have an opportunity to recieve additional evidence and determine whether the finding of a murder weapon by police was a result of the improperly obtained, oral statement from appellant. If so, the weapon must be suppressed.'

"In this case counsel submits that it is clear that the statements made by the Appellant on April 8 and April 9 were obtained in violation of his Fifth and Sixth Amendment rights. In turn, the information obtained in the first statement was the basis for the search warrants, and therefore, under the authority cited above, all evidence seized pursuant to those search warrants should be suppressed. The lower Court erred by not granting Appellant's Motion to Suppress this evidence."
Appellant's Brief, pp. 112–148.

A reading of the record satisfies me that defense counsel's portrayal of the interrogation setting is 100 percent accurate. The State's brief makes no contention that it is not. The authority relied upon is persuasive. The case is reminiscent of *State v. Monroe*, 101 Idaho 251, 611 P.2d 1036 (1980) (*Monroe I*), where a majority of this Court held that:

"The trial court made the factual determination essential to its ruling that the defendant's confession is admissible, and we are not at liberty to reverse that decision where the trial court's findings are supported by substantial evidence."
101 Idaho at 259, 611 P.2d at 1044.

I was unable to concur, but declared that it was "impossible for me to conclude that Monroe's waiver of his right to counsel was made 'voluntarily, knowingly, and intelligently.'" 101 Idaho at 260, 611 P.2d at 1045. After the Supreme Court of the United States vacated this Court's judgment and remanded for further consideration in light of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), in May of 1982, which was six months *after* Bainbridge's trial, we reached a new and different judgment, reversing the conviction and remanding for a new trial. *State v. Monroe*, 103 Idaho 129, 645 P.2d 363 (1982) (*Monroe II*). The Court's opinion likened the *Monroe* interrogation to *Edwards* and ruled that "following *Edwards*, we find that because the defendant asked for counsel three times and was not given the opportunity to deal with the police through counsel, the confession that was a result of police-initiated interrogation must be suppressed." *Monroe II*, 103 Idaho at 131, 645 P.2d at 365. Writing separately, I likened the case more unto *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), where the High Court held that:

" '[T]he <u>Miranda</u> safeguards come into play whenever a person in custody is subjected to either express questioning <u>or its functional equivalent.</u> That is to say, the term "interrogation" under <u>Miranda</u> refers not only to express questioning, but also to any words <u>or actions</u> on the part of the police (other than those normally attendant to arrest and custody) that the police <u>should know</u> are reasonably likely to elicit an incriminating response from the suspect. The lat-

ter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that **the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to object proof of the underlying intent of the police.** A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.' 100 S.Ct. at 1689–90."

*Monroe II*, 103 Idaho at 131, 645 P.2d at 365 (underlining original) (bold added) (footnotes omitted).

Bainbridge's case is more like *Innis* than *Monroe I* or *Monroe II*. Here, we start out with the fact that the Detectives Pfeiffer and Killeen obtained Bainbridge's signature to a document which was at the same time both a *Miranda* warning and a waiver of rights, dated April 8, 1981, at 6:40 p.m.

ADA COUNTY SHERIFF'S DEPARTMENT
BOISE POLICE DEPARTMENT

NOTIFICATION OF RIGHTS

1. You have the right to remain silent. *RWB*
2. Anything you say can and will be used against you in a court of law. *RWB*
3. You have the right to talk to a lawyer and have him present with you while you are being questioned. *RWB*
4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. The Ada County Public Defenders Office is available to you at this or any future time. *RWB*
5. You can decide at any time to exercise these rights and not answer any questions or make any statements. *RWB*

RIGHTS WAIVER

1. I understand each of the above rights explained to me. *RWB*
2. Having these rights in mind, (I do), (I do not) wish to talk to the officers now. *RWB*

Signed *Randall Wayne Bainbridge*
Place *Boise, Police Dep*
Date *4-8-81* Time *6:40 PM*

It is to be observed that the statement of rights includes, as well as the right to counsel, the equally important right "to remain silent." A reading of the record establishes for certain that Bainbridge did elect to remain silent, at least until he talked with his parole officer. And it is as equally certain that the detectives did not scrupulously honor that right. But, it was only *after* Bainbridge was induced to sign the waiver that the detectives turned on the tape recorder. This is uncontroverted, and readily substantiated by the first page of the transcript of the cassette tape:

"This is an interview being conducted with Randall Wayne Bainbridge. Today's date is April 8, 1981, the time is 6:41 p.m.

"PFEIFFER: Mr. Bainbridge, have you been advised of your rights?

"BAINBRIDGE: Ah, yes I have.

"PFEIFFER: And did you sign a rights form?

"BAINBRIDGE: Yes, I did.

"PFEIFFER: OK. You've agreed to talk to us, we have some questions for you about this situation in Garden City and we're kinda interested in finding out, you know, what, if anything, you know about it. It's going to help us, you know, help us put together a ah suspect. You know, somebody who might, who might be involved in this. So, you understand why you're here and everything?

"BAINBRIDGE: Yea, I do."

State's Exhibit 117.

The trial court in denying the suppression of the product of the September 8 interrogation did state "I conclude that defendant did not make a request for an attorney on the 8th of April," in the first paragraph of its Order, but thereafter vascillated to the conclusion that it was an equivocal request:

"Although defendant Bainbridge contends that he invoked his right to counsel at the April 8th interview, and that his request was not honored, as previously mentioned, the defendant's contention is in direct conflict with the testimony of Investigator Pfeiffer who stated that he was absolutely certain that the defendant did not ask for an attorney to be present. Furthermore, at the time of the hearing, the defendant testified, in regard to this, as follows:

'Q. Can you tell the Court what occurred when they arrived?

'A. When they arrived, they asked me if they could ask some questions about the murder that happened around the corner and I told them, I says, "well, are you from my parole officer?" I said "Did he send you up?" and they said, "no." and I says, "well, I'd like to have an attorney or at least my parole officer with me when I say anything at all." '

And later on when his attorney asked him:

'Q. Did you discuss with them the possibility of obtaining an attorney before you answered any questions?

'A. Yes, I did. If my parole officer, hadn't been there, or could be there.'

"Therefore, even accepting the testimony of Mr. Bainbridge, he at best made an equivocal request for counsel. The record indicates that he was primarily desirous of having his parole officer present, and only wanted an attorney if his parole officer couldn't be there. He did not clearly assert a right to counsel prior to that interview on the 8th."

R., p. 192.

The balance of the trial court's decision is clearly predicated on the basis that notwithstanding a request to have counsel, Bainbridge *thereafter* voluntarily waived that right, and that it was a waiver intelligently and knowingly made:

After examining the totality of the circumstances surrounding the statements which defendant made at that time, as required by *State v. Padilla*, 101 Idaho 713 [620 P.2d 286] (1980), it appears that the defendant's statements were voluntarily made. The investigators arrived at the defendant's home sometime during the afternoon. Defendant answered the door whereupon the investigators identified themselves. They asked the defendant if he would be willing to discuss the events of April 6, 1981, wherein he stated that he would if his parole officer were present. Testimony by all parties indicate that he willingly left the house with the investigators, and did not object to going to the Public Safety Building. He

had no hesistancy in executing the Miranda acknowledgement and waiver form after being told that his parole officer would arrive soon, and the taped interview following that indicates that he freely talked to his parole officer and then the officers themselves.

As stated by the court in the *Padilla* case, "an express written statement of waiver is usually strong proof of a voluntary waiver," but is not inevitably conclusive on that issue. The record here indicates that the interrogation took place at 6:41 p.m. and terminated at 8:20 p.m. The defendant was not subjected to an exhaustive session in the early hours of the morning. Rather the period of interrogation was relatively short and at a reasonable time of day. Although controverted, it appears that Mr. Bainbridge did travel voluntarily with the officers to the Public Safety Building. I agree with plaintiff's counsel that the Miranda rights were established to protect an accused from interrogation sessions tainted with coercion, trickery and promises. In this case I can find no indication that the defendant's statements were so obtained.

Counsel also correctly points out that in addition to being voluntary, a defendant's waiver of *Miranda* rights must also be made knowingly and intelligently. Idaho cases have recognized that a valid waiver may be made by a defendant even though he may have difficulty with the English language, (*State v. Powers*, 96 Idaho 833 [537 P.2d 1369] (1969) and even when a defendant is, as Dr. Jean Gardner described the defendant, in the dull normal range of intelligence (*State v. Sandaval* [Sandoval], 92 Idaho 853 [452 P.2d 350] (1969)).

Also pertaining to this question is *State v. Hatton*, 95 Idaho 856 [522 P.2d 64] (1974). Under the circumstances in this case, I think the defendant here knowingly and intelligently waived his Miranda rights on the 8th of April, because he had previously been involved with the law, and was previously exposed to *Miranda* warnings and rights, and on

April 9, 1981 he invoked a right to counsel at the very beginning of the interview, commenting that the statements he made would be used against him. Although Dr. Gardner testified that she read important things to the defendant, when asked whether she knew if the defendant had trouble reading things and understanding them for himself, she said she did not know. (Deposition of Dr. Gardner P. 8, line 23–25). Furthermore, Dr. Gardner testified that adequate testing had not been conducted to determine for sure that defendant had organic brain syndrome.

Accordingly, I cannot agree with the defendant that the totality of the circumstances indicates the statements he made on April 8th were not made voluntarily, and were the product of the activities and statements of the investigators. After reviewing all the statements and activities pointed out by defendant, together with the deposition testimony of Dr. Gardner and Michael Murphy, I conclude that under the totality of the circumstances the defendant knowingly, intelligently and voluntarily waived his constitutional rights and made a voluntary statement to the officers on April 8th, admissible as evidence against him.

It seems inescapable that this Court should confine itself to addressing that question of voluntariness of the waiver, and whether there was a waiver knowingly and intelligently made.[1] Having independently done

---

1. On the question of requesting counsel, I agree with defendant's counsel that the detectives did have completely within their control the ability to tape their conversations with Bainbridge which resulted in his signing the waiver. On that reason alone any close factual issue should be resolved in defendant's favor. Moreover, the trial court, in reaching the conclusion first reached, remembered the defendant's proof as only being that defendant "contends he made a statement to the effect; 'I'd like my parole officer or an attorney present.'" But defendant's testimony was:

"A. When they arrived, they asked me if they could ask some questions about the murder that happened around the corner, and I told them, I says, 'Well, are you from my parole officer?' I said, 'Did he send you up?' And they said, 'No.' And I says, 'Well, I'd like to have my attorney or at least my parole officer with me when I say anything at all.'

"Then they asked me to sign a rights piece of paper and I told them no.

"Q. That was at the house?

"A. Yeah.

"Q. So you refused to sign the waiver form at that point?

"A. Yes.

"Q. Did you discuss with them the possibility of obtaining an attorney before you answered any questions?

"A. Yes, I did. If my parole officer hadn't been there, or could be there.

"Q. Okay. What did they say to you with regard to the possibility of having—

"A. They said—

"Q. —an attorney?

"A. They said that there was no way they could, they could comply with that.

"Q. Did they want to ask you some questions, anyway?

"A. Yes.

"Q. Okay. What occurred there at the house, then, as far as making arrangements to make a statement to the police officers?

"A. Well, they—they kept trying to—they asked to go in the other room, and when they got in there, they asked to go into the other room to—I don't know—to be private, I guess, and there was no way they could. There wasn't—I mean, under my circumstances, I guess the way—the way they felt there was private enough, have a place to go to have any discussion at all.

"Q. Okay. What did you finally—what did you finally decide on as far as answering the questions?

"A. Well, I asked them if they couldn't get my attorney to get a-hold of my parole officer and I would say in front of him I would give a story.

. . . .

"Q. Did you go and sign a rights waiver form then?

"A. Yes, I did, because they said he would soon be there.

"Q. Did they ever explain to you what was on that piece of paper?

"A. Just the rights. They just said it give me the rights to remain silent; that was all.

"Q. Did you have any other—did you have any more discussions with regarding the possibility of having an attorney present?

"A. Well, I asked them for an attorney, but they said they could only get my parole officer through a phone call and he would be there soon, and, no, they didn't. They didn't have one available they said that they could get, go out and get.

"Q. They didn't have an attorney available?

"A. Yeah.

"Q. Okay. So then I presume you went ahead and you did make a statement to the police officers.

so, again I find it inescapable that on the basis of the presentation by defense counsel, it simply cannot be said that Bainbridge made a voluntary, knowing, and intelligent waiver of his constitutional rights. Going to the record for verification of counsel's presentation, I am particularly impressed by two items which touch on his capacity to make a valid waiver, especially under the domination of two skilled interrogators who could manipulate him at will:

"Q. Randy, what type of education have you had?

"A. What do you mean, what type of ed—I mean, I've went—

"Q. How much schooling have you had?

"A. Oh, I went up to my junior year.

"Q. In high school?

"A. Yes.

"Q. Did you ever graduate from high school?

"A. No, I did not.

"Q. Have you ever been involved in an accident involving some head injuries?

"A. Yes, I have.

"Q. Can you tell the Court what that was?

"A. Well, it was an incident with a— with a drunk, and we was in a Corvette car, '71, and we ran into a solid steel bridge and it put approximately 37 stitches in my skull, across my forehead, and I have had—I had a—they took a test of an elec—an electroencephalo-

"A. Yes, I did."
Tr., Vol. 10, pp. 31–34.

Mention must also be made concerning the majority's observation that Ruby Bainbridge (his wife) "never mentioned that appellant requested an attorney."

"Q. Okay. Can you relate to the Court what happened at that time?

"A. Two men approached the house and Randy answered the door. And he wanted to know if they were from the Parole office or—or if they were there to talk to him for some reason. I didn't hear the whole thing.

"Q. You didn't hear the entire conversation?

"A. No, I didn't hear the entire conversation.

"Q. Was there some conversation about them going somewhere and asking Randy some questions?

gram, I think it is; and other than that—I have another one with a motorcycle accident that put me in a coma for awhile. I fell off of a cliff and landed on my head, and the helmet I was wearing was a real—an old helmet, an old German helmet that didn't break, but it put me in a coma and—

"Q. When did that accident occur?

"A. Huh?

"Q. When did that accident occur with the motorcycle?

"A. Oh, about '78, I think.

"Q. Okay. Do you know how long you were in a coma?

"A. No, I don't. Oh, thirty—33 days, I was told.

"Q. Do you have any problems understanding things sometimes as far as reading or writing?

"A. Oh, what do you mean by—reading?

"Q. Do you have—let's say, do you have difficulty with reading, reading things and understanding them sometimes?

"A. Oh, yeah. I mean, I—I flunked English class. I mean, I never—never could read that very much.

"Q. Okay.

"A. I never could—could get into it that much.

"A. Yes, there was."
Tr., Vol. 10, p. 25.

An interesting note is that the prosecutor likely had talked with the detectives, and thus had information from them which was different from their testimony. At any rate, he argued: "The only two grounds I think [defense] counsel can really argue to the Court and what he directed his attention to was when he calls the request for counsel and the waiver. The only problem with the request for counsel is it's not documented, it's not verified, and it's not corroborated on April 8th by any indication other than the defendant's testimony and that of his wife."
Tr., Vol. 10, p. 187.

"Q. When you were presented with the rights waiver form that the police officers gave to you, did you read that?

"A. Yes, I did.

"Q. Do you feel that you really understood your constitutional rights at that point that you read it?

"A. Well, not really. I haven't—I don't think—I've been asked many times about my rights, and I never have fully understood exactly what they mean under the idea that I do have a right not to say nothing."

Tr., Vol. 10, pp. 37–39.

Later, at the sentencing hearing, he endeavored to say something in his own behalf:

"MR. BAINBRIDGE: Well, Your Honor, I really don't know exactly how to say what come up with this. But I would say that I am innocent, which I'll be found beyond a shadow of a doubt, I guess, that I ain't. But, uh, myself, I feel that if you feel that I should have whatever sentence, uh, I feel that I have power to—to go through with it.

"It's difficult for me to word things, because, I don't know, I ain't too good in English. But, uh, right now I'm kind of scared. But, uh, that's only noticeable. But, uh, I would like to say also that the defendant—prosecutor did a good job. I mean, that is his job, and—well, really can't think of much.

"I have a wife, and a child, and, uh, I hope to possibly have the opportunity to raise 'em. It ain't very easy.

"I wish to thank the witnesses that my attorney has picked out, and, uh, I'd like to say that maybe I would have had a—an easier, you know, better chance at this here trial if, uh, I wasn't in the position that I'm in. And if I had—if I had the opportunity and the money, I guess, to support myself, maybe it would have been better.

"I wish maybe also that I could talk easier, but for—at the moment, I can't."

Tr., Vol. 14, pp. 42–43.

Unlike *Iwakiri*,[2] *supra*, where I pointed out that the Court was making a rule for a second trial which would never take place, here there will be a second trial. If it is to be an errorless trial, it is important that this Court not return the case to district court where the prosecution is free to use the tape and transcript of the September 8 interrogation. At the very least the majority, perhaps not entirely acquainted with a voluminous record, should leave for the district judge the determination of the admissibility of Exhibit 117, and/or the tape recording. My vote, however, is to exclude it as urged by defense counsel. But, as urged by Solicitor-General Thomas in the State's brief, suppression of the cassette and transcript (which the prosecution did not utilize at trial) *may* not mandate the suppression of items of evidence seized under the search warrant, the issuance of which was based on Bainbridge's answers in the September 8 interrogation. That possibility, not addressed by the majority, should be left for trial court determination.

Touching again upon the tapes, and a second trial, if there is again a guilty verdict, at sentencing the tape and/or transcript of the September 9 interrogation should be excluded from consideration. As I have stated, the trial court properly kept it from the jury. The court believed that *Edwards, supra,* was better law than *Monroe I*—upon which the prosecutor relied, and *Monroe II* was six months away. But, over objection, the trial court did allow the prosecutor to introduce the September 9 interrogation at the sentencing hearing. And, although such will probably happen again, it will clearly be error, but error brought about by this Court's strange holding in *Sivak.* I refer to the announcement of the theory or doctrine of different and broader ranges of information available to a sentencing judge, *State v. Sivak*, 105 Idaho 900, 907, 674 P.2d 396, 403 (1983), where the majority favorably viewed wholesale use of Bainbridge's unsworn statements in the fixing of a death penalty for Sivak. There is little to be gained by

**2.** As forecast in my *Iwakiri* opinion, that action was dismissed shortly after remittitur.

repeating that which is set forth, documented in my *Sivak* opinion, 105 Idaho at 917, 674 P.2d at 410. It is a monstrous principle, and certainly not one of any law with which I am acquainted. And, based on the direction a majority of this Court has gone in this area, hand-in-glove with denying a defendant the guarantee of the Idaho Constitution that his fate be decided by a jury of his peers, that same majority sees court sentencing as a valid excuse for allowing a sentencing judge unfettered leeway to receive all sorts of letters, editorials, and hearsay unsworn statements—which no supreme court in the country would ever allow to be placed before a sentencing jury. Which statement should again be augmented with the absolute denial of the right of confrontation which attends such a horrendous procedure.

As a near final note, today's reversal of the conviction moots the issue raised by the denial of a change of venue, although the majority addresses it nonetheless. But, because there will be a second trial, and because again the defendant logically will try to move this case out of this county, the district court may well again consider, as was considered in this case, the importing of jurors from Nez Perce County—which in my view, based on a similar experience where Ada County jurors were selected for a jury trial in Grangeville, is better done at the outset.

And, as a final note, in reviewing the record, I chanced across an order which set defense counsel's pay, sole counsel in a first degree murder case, at $35.00 per hour. There are some jurisdictions where two counsel are appointed in capital cases, and such would certainly be in tune with the requirements of Idaho statutory law governing the appointment of counsel with indigents. The record in this case of the efforts of defense counsel at and preceding trial and on the appeal display that exact full measure of dedication and devotion which brings great respect to the trial bar. I for one am appalled at the rather inadequate compensation which was counsel's monetary award. If he has yet to be compensated for this appeal, I would hope that the trial court gives serious consideration to the hourly rates which this Court approves—none of which to my recollection have even approached a low of $35.00 per hour, and none of which involved the awesome responsibility of representing a defendant charged with first degree murder.